HARRY E. SHONFELD, Appellant, *v.* BESSIE SHONFELD, Respondent

(Argued October 27, 1932; decided January 10, 1933.)

*Jacob S. Manheimer* for appellant. The plaintiff is entitled to a decree of annulment as a matter of law. (*Weill* v. *Weill*, 104 Misc. Rep. 561; *di Lorenzo* v. *di Lorenzo*, 174 N. Y. 467; *Griffin* v. *Griffin*, 122 Misc. Rep. 837; 209 App. Div. 883; *Svenson* v. *Svenson*, 178 N. Y. 54; *Rubman* v. *Rubman*, 140 Misc. Rep. 658; *Domschke* v. *Domschke*, 138 App. Div. 454; *Libman* v. *Libman*, 102 Misc. Rep. 443; *O'Connell* v. *O'Connell*, 201 App. Div. 338; *Harris* v. *Harris*, 201 App. Div. 880: *Watkins* v. *Watkins*, 197 App. Div. 489; *Rutstein* v. *Rutstein*, 221 App. Div. 70; *Aufiero* v. *Aufiero*, 222 App. Div. 479; *Raphael* v. *Raphael*, 222 App. Div. 664; *Sheridan* v. *Sheridan*, 186 N. Y. Supp. 470.)

No appearance for respondent.

CROUCH, J. The action is to annul a marriage for fraud. " Marriage," says the statute (Dom. Rel. Law; Cons. Laws, ch. 14, § 10), " so far as its validity in law is

concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential." So it was, too, before the statute was enacted. (*Ferlat* v. *Gojon*, 1 Hopk. Ch. 478.) The essentials of marriage as a civil *contract* are, therefore, (a) consent by (b) parties having statutory capacity to give it. Any lack in those essentials makes the marriage void (Dom. Rel. Law, §§ 5 and 6) or voidable (Id. § 7). If either party consents by reason of fraud there is no reality of consent. Hence the marriage is voidable (Id. § 7, subd. 4) and an action may be maintained to annul it. (Civ. Pr. Act, § 1139.) While the jurisdiction of the court to annul is purely statutory (*Walter* v. *Walter*, 217 N. Y. 439) it is equitable in its nature (Cf. *Bays* v. *Bays*, 105 Misc. Rep. 492, 500), particularly where fraud is charged. (Cf. *Ferlat* v. *Gojon, supra; Fisk* v. *Fisk*, 6 App. Div. 432.) The statute is silent as to what constitutes fraud. The Legislature perhaps adopted the traditional attitude of equity, which has ever refused to define, lest the craft of man evade the definition. (*Lawley* v. *Hooper*, 3 Atk. 278.) The court is left free to meet each case as it arises and to apply to the defendant's conduct the immemorial test of fair and conscientious dealing. But fraud alone is of no avail unless followed by the statutory consequence that consent to the marriage was given by reason of it. At this point one encounters the interpretation placed upon the statute by this court in *di Lorenzo* v. *di Lorenzo* (174 N. Y. 467). Not every fraud by reason of which the particular individual may have given consent to the marriage is an adequate basis for annulment. On the other hand, the fraud need not necessarily concern what is commonly called the essentials of the marriage *relation* — the rights and duties connected with cohabitation and consortium attached by law to the marital status. (*di Lorenzo* v. *di Lorenzo, supra; Beard* v. *Beard*, 238 N. Y. 599; *Domschke* v. *Domschke*, 138 App. Div. 454.)

Any fraud is adequate which is " material, to that degree

that, had it not been practiced, the party deceived would not have consented to the marriage " (*di Lorenzo* v. *di Lorenzo, supra,* p. 471), and is " of such a nature as to deceive an ordinarily prudent person." (Id. p. 474.)

With so much premised, we turn to a consideration of the case at hand. The action was undefended. Plaintiff testified that for some years prior to the marriage he had been keeping company with the defendant. On several occasions when the question of marriage was brought up by the defendant, the plaintiff had stated plainly that he was in no position to marry because he was not able to make a living; that he was working on and off with his father without a regular salary and just managed to keep himself going. In May, 1930, the subject was again broached by the defendant, who suggested that if it was merely a matter of sufficient money to establish him in a business of his own, she had enough, if such an opportunity presented itself. A month later there came such an opportunity. An acquaintance, aware that the plaintiff desired to go into business, suggested a partnership in a jewelry store to be leased in the Hotel McAlpin, in the city of New York. Seven thousand dollars was required. The acquaintance was able to contribute only $1,500, or $2,000. The defendant was made acquainted with this and she told the plaintiff that she had $8,000 which would be available. From that point on she took part in the discussions with respect to the proposed business and approved the partnership arrangements and the plans of the store. A lease of the store was to be closed on July 21. Before the execution and delivery of the lease, a deposit by way of security was required. The defendant refused to furnish any money before marriage. There was a civil marriage on July 15. It was not consummated. Each party returned to the parent's home where each lived. On July 19 the plaintiff went to defendant's home to secure the amount of the required deposit on the lease. He then discovered that the defendant did not have and

never had had any such money or the means of getting it. The trial court found as facts that the representations thus made were false, were believed and relied upon, did induce the plaintiff's consent to the marriage, and that if they had not been made he would not have consented. A decree was refused upon the ground that the representations did not go " to the essence of the marriage contract."

For reasons stated above, the ground of the decision is untenable. If the proof shows that the representations were of a nature to deceive an ordinarily prudent man who, but for the representations, would not have consented to the marriage, there is an adequate basis for a decree. The primary consideration in every case is the materiality of the representation viewed in the light of all circumstances by the mind, not of the individual plaintiff but of an ordinarily prudent man. To be material, the representation " must not only have induced the action taken, it must have been adequate to induce it by offering a motive sufficient to influence the conduct of a man of average intelligence and prudence." (1 Bigelow on Fraud, 497.) Present in every case as a circumstance which such a mind would necessarily consider is the important and irrevocable nature of the contract of marriage, affected, as it is, with a public interest and with resultant rights and duties unalterably fixed by law. The trier of fact in testing materiality by this objective standard on such a background is no doubt justified in rejecting, as immaterial, representations which in the case of other types of contract might lead to a different conclusion. Generalizations other than these may not be made. The boundaries of materiality must be pricked out by individual decisions. The question here is whether it can be said as matter of law that the representations made by defendant were not material. The Appellate Division by a divided court has in effect so said. We reach the opposite

conclusion. The obligation of a husband to support a wife is no less lightly to be entered into than the other obligations of the marital relation. The ability to support is correspondingly important. While plaintiff's attitude may have been something less than heroic, realization of the responsibilities of marriage need not be condemned as sordidly mercenary. The business which defendant's mythical money was to establish was plaintiff's only prospect of supporting her. The misrepresentation was not a mere exaggeration or misstatement of her means or prospects, which might or might not be an incentive to marriage. It was a definite statement of an existing fact without which, as defendant clearly understood, no marriage was presently practicable. It cannot be said as matter of law that either reliance or materiality hang upon an unreasonable or whimsical attitude on plaintiff's part. No public policy outlaws a marriage settlement agreement (cf. *Piper* v. *Hoard*, 107 N. Y. 73; *Kujek* v. *Goldman*, 150 N. Y. 176, 182) and no public policy demands that prudent consideration of ability to fulfill the duty of support shall not have a legitimate place in the determination by a party of whether or not to marry.

The judgment of the Appellate Division and that of the Special Term should be reversed and an interlocutory judgment of annulment directed in favor of plaintiff.

CRANE, J. (dissenting). The marriage in this case was a mere matter of bargain and sale. The woman bought the man for $6,000, and because she failed to have the money the man seeks to have the marriage annulled. The question really is whether the marriage ceremony in this State is of any binding force or whether it is an empty ceremony. Apparently *di Lorenzo* v. *di Lorenzo* (174 N. Y. 467) has been somewhat misunderstood in its application and some expressions in the opinion carried far beyond the authority of the case. (See *Powell* v. *Alabama*, 287 U. S. 45.) It is a fundamental principle

of *stare decisis* that a decision is an authority solely upon the points decided and the facts of the particular case. We would go far afield if we followed the expressions in the opinions used to illustrate or to exemplify the principle involved and determined. As Judge VANN said in *People ex rel. Metropolitan St. Ry. Co.* v. *State Board of Tax Comrs.* (174 N. Y. 417, at p. 447): " Certain expressions of learned judges, used *arguendo,* in discussing the subject of home rule, are relied upon by counsel as establishing a principle that controls this case. Principles are not established by what was said, but by what was decided, and what was said is not evidence of what was decided, unless it relates directly to the question presented for decision. ' General expressions,' as the great Federal jurist once said, ' are to be taken in connection with the cases in which those expressions are used ' (*Cohens* v. *Virginia,* 6 Wheat. 264, 399)." The *di Lorenzo* case decided two things. It decided that the woman, in order to be married, had practiced a gross fraud, and it further decided that the man had no way of protecting himself against the fraud by the exercise of diligence and care. The facts are that a woman represented to a man, with whom she had been having intercourse, that she was pregnant by him and that a child had been born. The woman represented that the child had been born while his father was away from the State and she exhibited to him the child when he returned. The fact is that she had not given birth to any child. GRAY, J., in writing for the court, said: " It was a gross fraud and, upon reason, as upon authority, I think it afforded a sufficient ground for a decree annulling the marriage contract." In laying down the rule that the false representations must be of such a nature as to deceive an ordinarily prudent person (pp. 473, 474 and 475), the judge said: " The plaintiff had a right to rely upon the defendant's statement of a fact, the truth of which was known to her and unknown to him, and he was under no obligation to verify a statement, to the truth of which she had pledged herself."

In commenting upon this decision, in an article in 6 Cornell Law Quarterly (p. 401), CROUCH, J. (now of this court), noted these two principles as established by this case: (1) The representations which would justify an annulment must be material; (2) the representations must be such as to deceive the ordinarily prudent person. All the authorities in this country agree upon these points, the conflict, if any, centering around the determination of what is a material representation.

Let me call attention in the case before us to this second element of an annulment action, which is as important as the material false representation. A person has no right to rely upon every representation. Before the law all are measured by the standard of the reasonably prudent and careful man. Even in annulment actions one is not to be relieved by the courts if he is so stupid and foolish as to believe statements which his own eyes or ears could have discovered to be false in the exercise of a little care. Neither are the judges and the courts to be fooled in an undefended annulment action by the whimper of a party that he was deceived, when he has no one to blame but himself. The law makes no adjustments of those marital difficulties brought about by a person's own indifference to and disregard of his own welfare. Care and caution are required and have been emphasized in all the cases dealing with this subject of annulment for fraud.

What are the facts in this case? Harry E. Shonfeld and Bessie Shonfeld, his wife, prior to their marriage in the Municipal Building, in New York city, on July 15, 1930, had known each other for seven years; being so intimate in their relationships as to talk about getting married for a long time previous to the event. Financial matters had been discussed between them so that Harry must have known Bessie's family, circumstances in life and financial condition. He wanted to go into the jewelry business with a man named Harry Ostrow, who

needed $6,000. Bessie said she had $6,000 and would give it to them if Harry married her. After the marriage Bessie said she was to borrow the money from her aunt but could not get it, and her father offered to put up a thousand dollars. This is the whole case. The husband pleads that he relied upon the false and fraudulent representations that Bessie had $6,000. He made no inquiry whatever about it. He never asked her where she had it or where she was going to get it. He did not inquire whether it was in the savings bank or in securities. He had been intimate with her for seven years and knew her condition and circumstances in life. He had frequently told her that he had no money, yet when she said she had $6,000 he never asked where it was or why she had said nothing about it during the two years' delay in getting married. To rely solely upon the mere statement, under these conditions, was blind folly. Love is blind, but in this case there was no love. The plaintiff concedes it was a purely commercial transaction. He, therefore, failed to exercise any care or caution, and has only himself to blame for his predicament. As Lord Stowell said in *Wakefield* v. *Mackay*, 1 Phill. Ecc. 134 (cited in 1 Bishop on Marriage and Divorce [6th ed.], § 167): " A man who means to act upon such representations should verify them by his own inquiries; the law presumes that he uses due caution in a matter in which his happiness for life is so materially involved, and it makes no provision for the relief of a blind credulity however it may have been produced."

The plaintiff's testimony runs as follows: " Well, she wanted to know — we had been going together on and off for about seven years, and two years previous to the time that I did get married she wanted to know, or she asked me what my intentions were so far as she was concerned. And I told her at the time that I was in no predicament or position to enter on the sea of matrimony at the present time, because I was not able to make a

living. * * * Well, in May, 1930, she asked me if I had decided to do anything as yet, and I said that I was in the same position as I was before, and that I can't see my way clear in getting married at the present time, because, as I said, I have nothing to fall back on, but if I could get myself into a little business or get a good position, why, I could think of it. And she said, ' Well, what — if it is just a case of getting into business, I have a little money, where I could help you out, if something worth while came along that seemed good to you, and it would please me.' * * * She said before she was going to put any money in, she wanted me to get married first."

For failure to exercise the ordinary caution of a reasonably prudent and careful man dealing in financial matters this plaintiff can obtain no relief in equity, as one of the cardinal principles, as heretofore stated, in annulment actions for fraud, is that the false representations must have been such as to deceive the ordinarily prudent person. For this reason, if for no other, the judgment below should be affirmed.

But while we are upon this subject, it may be well to utter a word of caution regarding some of the things which have been said in the *di Lorenzo* case. As an authority we must remember that the fraud was a gross fraud, going to the very essence of the marriage relation, so that the court felt that a decree of annulment should be granted to the husband, although ten years had elapsed after consummation of the marriage. Whatever was said in the opinion must be viewed in the light of the facts. While marriage in this State is a civil contract, meaning thereby that it takes its validity and binding force from State laws, and not through religious ordinances, the marriage contract is more than a civil contract, which deals merely with property rights. From its very nature it establishes a status from the time of the contract and not from the time of consummation or

cohabitation. While a court of equity may at times consider the fact that there has been an immediate desertion after a marriage, and no consummation, this is a circumstance and not a vital element. The law fixes the status from the time of the marriage ceremony and all property rights and marital obligations and privileges begin from that time. The public policy of this State, as of all other States in this Union, plays an important part in the marriage contract. (*Wade* v. *Kalbfleisch*, 58 N. Y. 282, 284; *Maynard* v. *Hill*, 125 U. S. 190.) The married couple cannot do as they please with the marriage contract. Whatever may be their freedom of action regarding their own morals, the law does not view marriage lightly or leave it to them to destroy at will.

Because of the statements properly made in the *di Lorenzo* case, when dealing with its facts, that marriage was a civil contract like any other contract, and could be dissolved for fraud, the bar have at times pressed these words out of their setting and meaning. Thus, in *Schaeffer* v. *Schaeffer* (160 App. Div. 48, 49) an annulment of the marriage was sought upon the ground that the defendant had falsely represented that he loved the plaintiff. Mr. Justice CARR remarked in the opinion, denying relief: " But I think we have not yet arrived at a legal stage which requires an annulment of a marriage because one party or both parties were untruthful to each other in their mutual protestations of all-consuming and undying love. Marriage is yet a status on which depends the idea of a family, and on which in turn has arisen the structure of civilization as we know it." After seventeen years of marriage an attempt was made to annul a marriage upon the ground of false representations as to love and affection in *Griffin* v. *Griffin* (122 Misc. Rep. 837); and in *Williams* v. *Williams* (71 Misc. Rep. 590) annulment was sought on the ground of misrepresentation as to age. A warning of the fraud which might be attempted in annulment actions under the very broad

words of the *di Lorenzo* case was given in the critical notes upon this subject to be found in 1 Cornell Law Quarterly, 48, and 6 Cornell Law Quarterly, 199; 24 Harvard Law Review, 157.

We must recognize that the marriage contract can never be on a par with other civil contracts because of its very nature. Other contracts deal with money values or property interests; not so, the marriage contract. Money damages can be ascertained, at least by approximation, for the breach of a civil contract, and even for the breaking of a promise to marry, but no such element finds place in the contract of marriage itself. The utmost the law can do is to dissolve the status for fraud or for disability. Every jurisdiction recognizes that marriage procured by false and fraudulent representations may be annulled in equity. What are the false and fraudulent representations which the courts will consider material? The difference in opinion, as found in the decisions, is over this question of materiality. Surely every representation leading up to marriage cannot be material,— the fact that a brunette turned to a blond over night, or that the beautiful teeth were discovered to be false, or the ruddy pink complexion gave way suddenly to pallor, or that a woman misstated her age or was not in perfect health, would lead no court to annul the marriage for fraud. This court said in *Lapides* v. *Lapides* (254 N. Y. 73, p. 80): " The fraud which may dissolve the marriage tie must relate to something vital." And in section 167 of Bishop on Marriage and Divorce (Vol. 1, 6th ed.) we find the almost universal rule to be that " In that contract of marriage which forms the gateway to the marriage status, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident, or, in general, from fraudulent practices, in respect to the character, fortune, health, or the like, does not render void what is done."

Fraud assumes many different forms and it has always been impossible to predict just how it will appear. No definite rule can be stated for matrimonial actions any easier than it can be stated for any other class of fraud actions. We may say, however, that because of the importance of the marriage contract and the status established thereby the courts will not treat the matter lightly and will only deal with those representations which are serious, grave and important; the representations must be proved by clear and convincing evidence to have been a vital and dominant element in entering into the contract. What induces a man to marry a woman? Who can tell? Are the judges wiser than other men? This is a matter which better not be inquired into too inquisitively, as it has baffled the philosophers of all ages. Law moves not upon supposition or guess, but upon evidence. The false representations inducing a marriage must be so weighty and material that the courts can say that they would have influenced the consent of a man of average intelligence and prudence. (See *Beard* v. *Beard*, 238 N. Y. 599; *Minner* v. *Minner*, 238 N. Y. 529; *Svenson* v. *Svenson*, 178 N. Y. 54.)

The representations in this case do not rise to this importance. The man says he married the woman to get $6,000. Suppose it had only been a hundred. Where will the courts draw the line? Some other element than mere money must enter into the representations to move the court to annul a marriage. There may be occasions when representations as to who and what a person is may be very vital in procuring the consent to marriage. These matters are given attention by careful persons in entering into matrimony. Deception as to these circumstances may lead to annulment, but the courts have not yet gone so far as to recognize marriage as a mere matter of bargain and sale or to annul it because one of the parties is disappointed in the material wealth of the other. Sufficient for this case to say that the mere

statement of the woman that she had $6,000 was not sufficient to deceive a reasonably prudent and careful man, and under the circumstances stated here is not of sufficient importance to the marriage contract to move a court of equity to annul it.

Most of the annulment cases upon the ground of fraud are defaults. The parties seek by this easy means to obtain a decree dissolving the bonds of matrimony. In a divorce case based upon adultery the innocent party is prohibited from testifying. Whatever he or she knows about the guilt of the other cannot be told. Not so in annulment cases. The plaintiff becomes a ready witness and glibly recites his or her story in the absence and default of the other party. This has led the courts to say that the proofs should be strong and convincing in these annulment cases, and that the false representations must go to a vital part of the marriage contract. It should clearly appear not only that the representations were made but that the facts stated were of such weight and seriousness as to induce reasonable persons similarly situated to rely and act upon them.

The referee to whom this matter was referred found against the husband.

The judgment of the Special Term dismissing this complaint, affirmed by the Appellate Division, should be affirmed by this court.

POUND, Ch. J., KELLOGG and HUBBS, JJ., concur with CROUCH, J.; CRANE, J., dissents in opinion, in which LEHMAN and O'BRIEN, JJ., concur.

Judgment accordingly.