CLENDENIN J. RYAN, JR., Plaintiff, *v.* MARIE WURMBRAND-STUP-PACH RYAN, Defendant.

Supreme Court, New York County, July 16, 1935.

*Chadbourne, Stanchfield & Levy* [*George W. White* of counsel], for the plaintiff.

*Nathan Burkan* [*Louis D. Frohlich* of counsel], for the defendant.

COTILLO, J. This is an action brought by the husband to annul the marriage entered into by him with defendant, upon the ground that his consent thereto was obtained by fraud. By order duly made pursuant to the provisions of section 465 of the Civil Practice Act, the issues were referred to a referee to hear the proofs

of the parties, to take the testimony and to report thereon to this court with his findings. Such referee has filed his report herein, recommending and finding that the plaintiff is entitled to a decree of annulment on the ground of fraud. The motion now before the court is for an order confirming such report and for an interlocutory decree of annulment.

The facts found by the referee suffice to establish the truth of the material allegations of the complaint. An examination of the testimony and exhibits discloses that the findings are amply supported by satisfactory proof. The documentary evidence alone establishes the existence of a plot or scheme, concocted in a foreign country by members of the so-called nobility or titled class, who had been rendered desperate by needs engendered by poverty and a desire to obtain means to continue their luxurious existence by any method save of honest effort. The plan was to inveigle some wealthy American, or the scion of some family of wealth and standing here, into marriage with defendant in order that she might by some means force her husband or his family to provide her with a substantial sum of money, which, it was planned, was to be used to relieve the existing financial distress of defendant and her mother. Upon accomplishing this object, defendant planned to return to her former suitor, for whom she still retained an infatuation which rendered impossible any real or honest affection for a husband. By chance, or mischance, perhaps, plaintiff was chosen to fill the latter role. An introduction was secured and events moved rapidly, the marriage resulting about thirty days after the first meeting, due largely to defendant's false representations that her mother would, if she learned of it, take all possible steps to prevent an alliance with any one not of noble blood.

It is undoubtedly true that defendant was young, in years at least, and was used as a pawn in the game which originated in the minds of older and craftier schemers. Her youth and attractiveness were elements essential to success, and it is apparent that defendant used them effectively and entered whole-heartedly into the plot. She was successful so far as the desired marriage was concerned, but like most attempts to produce " the perfect crime," the scheme failed of success in the very particular for which it was designed. It did not produce the desired cash, hence the marriage, a mere step in the scheme, was a failure.

The facts disclosed, as found by the referee, constitute the legal grounds for annulment specified by the Legislature (Civ. Prac. Act, § 1139) and meet the tests of legal sufficiency laid down by our Court of Appeals. (*Shonfeld* v. *Shonfeld*, 260 N. Y. 477.)

It cannot fairly be said that plaintiff was unduly gullible, or was misled when he should have been suspicious. Defendant's youthful

attractiveness, her appearance of naïve innocence and her apparently genuine but actually false representations of her desire to escape from her mother's determination to compel her to contract an unwelcome European alliance, all appealed to his sympathies and sense of chivalry. Pity is said to be akin to love, and plaintiff undoubtedly did fall in love with defendant. He obviously was unaccustomed to dealing with the workings of a shrewd and cunning European mind and doubtless was attracted by the glamor of foreign titles and his contact with continental nobility. In permitting himself to be deceived by the sham of class or caste based upon an accident of birth, plaintiff lost sight of the fact that his own country is firmly grounded on principles opposed to divine rights of titled personages, and that his own forbears risked their all to free this land once and for all from the baneful results of such a social system.

The records of our courts and the public press afford ample proof that alliances between Americans of either sex with titled foreigners are fraught with peril and almost invariably end in disaster. Great publicity has recently been given to the affairs of one of our American heiresses who contracted a marriage with one member of the " foreign nobility " (a prince), and within a short time applied to the divorce courts of Reno to dissolve that alliance in order that she might immediately contract a second of the same kind. She did not permit the ink to become dry on the divorce papers before her second foreign entanglement arrived on board ship and a second marriage was entered into. It is not a source of satisfaction to see our marriage institution and our courts made mere incidents to the purchase and sale of foreign titles. While it is not the province of the courts to attempt to regulate the affairs of the rich or the poor, save in specific cases brought before them, the increasing number of cases of this character which are being brought emphasizes the fact that international alliances, based on nothing more than the possession of wealth by one party and of title or claim to noble lineage on the other, is doomed to failure and invariably ends in litigation of a character that does not add to the prestige of our American culture or civilization. I regret my inability to put the record of this case into the hands of Americans who intend to enter into any foreign matrimonial alliances. It would disclose that the only consideration for foreign nobility to contract marriages with Americans is gold. Public policy alone compels me to suppress the record in this case.

In the present case neither wealth, social position nor noble descent of the respective parties has any bearing on the issues of law and fact which have been litigated before the referee. Defendant, while making affirmative representations to the contrary, was actually entirely devoid of any intent to enter into a permanent

marriage relationship with plaintiff for any of the valid or sacred purposes of that institution, but intended and attempted to use her marriage to plaintiff solely for financial gain with the avowed purpose of returning to her former suitor as soon as she accomplished this unworthy object. If she were the one seeking relief here, there would be justification in withholding the aid of the court. Plaintiff, however, has been deceived and defrauded and is entitled to the judgment he seeks. American courts are eager and solicitous to uphold the contract of marriage, but foreign adventurers and adventuresses should be discouraged by our courts from seeking to make the sacred contract of marriage a mere contract of purchase and sale of decadent titles of nobility and making a mockery of the sanctity of the marriage vow.

The order confirming the referee's report, the decision and interlocutory judgment have been signed.