KATHERINE DART LEWINE, Plaintiff, *v.* RICHARD IRVING LEWINE, Defendant.

Supreme Court, Lewis County, December 24, 1938.

*George S. Reed*, for the plaintiff.

Defendant in default.

ZOLLER, J. Plaintiff has brought her action to annul her marriage to defendant on the ground of fraud on the part of the defendant.

The parties were married on the morning of September 30, 1938, by a justice of the peace in the town of Watson, county of Lewis, and State of New York. They separated within ten or fifteen minutes, while plaintiff's father was driving the newly-married couple to the city of Utica where they were to board a train for New York city.

Plaintiff is about twenty-five years of age and defendant twenty-seven. She is a Gentile and defendant is Jewish. They had known each other for about a year and a formal announcement of the engagement had been made at the plaintiff's home in Dayton, Ohio. Defendant lives at 895 Park avenue in the city of New York. The marriage took place in Lewis county in this State, where plaintiff's parents have a summer home and where she and her parents have spent considerable time over a period of many years during the summer season.

The marriage license had been issued on August 8, 1938, by the town clerk of said town of Watson, according to the provisions of section 13 of the Domestic Relations Law and the requirements specified in section 13-a of said Domestic Relations Law regarding a physician's examination and a serological test had been complied with by both plaintiff and defendant. The town clerk testified in this regard, however, that the certificates or statements of the examining physicians which were presented and delivered to her by the plaintiff and the defendant at the time they applied for their marriage license were not left or filed with her, but were taken away by the defendant more or less with her consent, in her belief at that time that it was not necessary to leave them with her; that, however, that very afternoon she wrote the defendant that he should return them to her, as it was then her opinion that they should have been filed with her, but that she had never received them from the defendant nor had any word or communication from him in relation thereto.

The marriage between these young people had first been set for September third. It was then planned to have a somewhat large gathering at said summer home, and it was understood between the parties that the county judge of an adjoining county was to attend and officiate. Many guests had been invited. Meanwhile,

plaintiff had sent to New York from her home in Dayton, Ohio, several trunks containing her personal belongings and clothing, and both plaintiff and defendant had inspected several apartments in the city of New York, where they were to live. However, some three weeks before September third, and more or less without any definite or direct cause, it was suggested by the defendant that the wedding be postponed and held more or less in abeyance, because he thought that at that particular time, namely, September third, he would be busily occupied in composing some musical score and did not want any interference with this important work. So, the wedding was, in fact, postponed and plaintiff's feelings toward the defendant of necessity changed. .

A few weeks later, while plaintiff was with some friends in Boston, defendant went there to see her and as a result of that meeting it was agreed that they should still keep in mind their possible marriage, bygones to be bygones. On the night of September twenty-ninth, while the plaintiff was with her parents at their summer home at Number Four in Lewis county, she received a long-distance telephone call from defendant in New York, who casually asked what she was going to do the next day. When advised that she had nothing specially planned for the day, defendant promptly suggested that they should be married and that he would come up from New York for that purpose. The next morning he arrived at Lowville on an early train and was met at the station by the plaintiff and her father. They had breakfast together at a local restaurant and thereupon proceeded to the justice of the peace of the township of Watson and were married. The ceremony was performed at about eleven o'clock that forenoon, and soon afterwards the plaintiff and defendant and plaintiff's father started on their way to Utica.

There is no question whatsoever of plaintiff's good faith. Her parents had consented to the marriage and she herself was anxious to live up to her promise to marry and to carry out the plans which they had made together. The same cannot be said of the defendant.

Soon after the marriage, and while on their way to Utica in plaintiff's father's automobile, defendant began to act in a very peculiar and strange manner, and finally requested plaintiff's father to stop the car so that he could get out and be by himself. When the car was stopped, defendant got out and began walking up and down the road some little distance back of the car for some little time. Finally, he returned to the car and, addressing plaintiff's father, said in substance that he would like to talk with him alone. Whereupon plaintiff got out of the car and went out of hearing distance. When she returned her father told her what defendant had said,

which was, in effect, that he thought the marriage was a mistake, and suggested that they return to the justice of the peace who had married them and have him destroy his records and in some such manner destroy as well the marriage status. Defendant said that he had seen such a method mentioned in an article written by a well-known columnist. However, instead of going back to the justice who performed the marriage ceremony it was agreed that they should go to a justice in the nearby village of Lyons Falls and submit the proposition to him. This was done and he very promptly assured the defendant and plaintiff's father that in his opinion no justice of the peace had any such authority. Whereupon defendant asked to be taken to the railroad station in order to catch a train for New York. Accordingly, he was driven to the station at Lyons Falls and has not been seen or heard from since.

There is no claim here that this defendant expressly made any material misrepresentations as to financial responsibility or physical well-being, upon which plaintiff relied and by reason of which she was induced to enter into the marriage contract. This is not the usual case of concealment or false representation. (*Robert* v. *Robert*, 87 Misc. 629; *Fontana* v. *Fontana*, 77 id. 28; *Libman* v. *Libman*, 102 id. 443; *Sobol* v. *Sobol*, 88 id. 277; *Weill* v. *Weill*, 104 id. 561; *Domschke* v. *Domschke*, 138 id. 454; *Gordon* v. *Gordon*, 225 id. 822; *O'Connell* v. *O'Connell*, 201 id. 338; *Lapides* v. *Lapides*, 224 id. 257; *Shonfeld* v. *Shonfeld*, 260 N. Y. 477; *Di Lorenzo* v. *Di Lorenzo*, 174 id. 467; *Blank* v. *Blank*, 107 id. 91; *Svenson* v. *Svenson*, 178 id. 54.) Nevertheless, plaintiff charges defendant with fraud, and in this court of equity seeks to have her marriage with him annulled. She says that defendant never intended to consummate his marriage with her and that such intention existed prior to their marriage. There was no consummation here.

Upon the proof, what may be said of defendant's intention to respect and perform the obligations of his marriage contract? As stated by Mr. Justice WHEELER in *Moore* v. *Moore* (94 Misc. 370, at p. 372): " The courts of this State hold that marriage is a civil contract, and will annul such a marriage, like other contracts, where the consent of a party to it has been procured by fraud or the misrepresentation of a material fact, especially in a case where the marriage has not been consummated, and the marriage relation has not fully ripened into the complications of a public status involving consideration of questions of public policy. (*Svenson* v. *Svenson*, 178 N. Y. 54; *Di Lorenzo* v. *Di Lorenzo*, 174 id. 472; *Domschke* v. *Domschke*, 138 App. Div. 464.) " Equity will interfere to grant relief where necessary to prevent the consummation of a fraud. (*Adams* v. *Gillig*, 199 N. Y. 314; *Freeman* v. *Freeman*, 43 id. 34.)

" Fraud * * * comprises all acts, omissions and concealments involving a breach of a legal or equitable duty and resulting in damage to another." (26 C. J. 1059.) A promise made without any intention of performing it, if made to induce another to surrender some legal right and which accomplishes the end designed, is actual fraud. (Id. 1060.)

The facts here are almost identical with the facts in *Moore* v. *Moore (supra)*. Quoting further from the opinion of Mr. Justice WHEELER, he said (at p. 373): " So one who goes through the marriage ceremony represents in so many words his intention and purpose to fulfill all the obligations of a husband to the woman he marries. We can conceive of no greater fraud on a woman than for the man at the same time entertaining and carrying out the purpose of forthwith absconding and leaving his wife to her own resources regardless of all the moral and legal obligations imposed by the marriage status. * * *

" We cannot suppose for one moment that the plaintiff would have married the defendant had she known it was the intention of the defendant to at once abandon her and never perform those obligations and duties the law imposed on him."

It is my conclusion that defendant's conduct, viewed as a whole, constituted a fraud upon this plaintiff, and that she is entitled to the relief which she now seeks. (*Coppo* v. *Coppo*, 163 Misc. 249; *Miller* v. *Miller*, 132 id. 121; *Moore* v. *Moore*, *supra*.)

Judgment may be entered annulling the marriage between plaintiff and defendant.