NOME THOMAS LAAGE, Plaintiff, *v.* HAROLD C. LAAGE, Defendant.

Supreme Court, Special Term, New York County, April 14, 1941.

*I. M. Tobias [Sylvester Benjamin* of counsel], for the plaintiff.

*Andrew S. Fraser,* for the defendant.

PECORA, J. Plaintiff sues to annul her marriage to defendant, upon the ground that he made certain false representations to her to induce her to marry him. She claims she relied upon these representations, believing them to be true; and that she would not have married him had she known they were false.

Although various misrepresentations are alleged by plaintiff, only one was proved upon the trial. That one was to the effect that defendant was a naturalized American citizen. Hence, the court will confine itself to that issue.

The uncontradicted evidence establishes that the parties were married in New York city on May 31, 1938, after a courtship

of about two weeks; that when defendant proposed marriage, the plaintiff — who had already been informed that defendant was a native of Germany — asked him if he had become naturalized as a citizen of this country. By way of reply, he inquired whether it would make any difference to her if in fact he had not been naturalized. She stated that it would, because she would not marry him unless he were an American citizen. When pressed for her reasons therefor, she said that she and her ancestors for many generations had been born in Vermont; that her family still resided there, and that they would not sanction her marriage to an alien. She said, further, that the Nazi regime and its philosophy of government were abhorent to her, and that she would not marry a German-born alien because, in the event of war between this country and Germany, she and her family would be arrayed against him and his kin. He thereupon told her that he had been naturalized. She then requested him to submit proof thereof. The following day he exhibited to her his so-called first papers or certificate of his declaration of intention to become an American citizen. She remarked that it was not a final decree of naturalization. He called her attention to the fact that the declaration had been made eight years before, and assured her he had since obtained his final decree, but that he had been unable to find it. She believed him, and within a few days they married. The marriage has been without issue.

They cohabited as husband and wife until sometime in the summer of 1939, when he alone went to Canada on a business deal involving the purchase or chartering of a boat. He had told her at the beginning of their acquaintance that he was a navigator. Upon the conclusion of his stay in Canada, he attempted to re-enter this country, but was denied admission because of his non-citizenship. At just about this time the present war broke out between the British Empire and Germany. The Canadian authorities, upon learning defendant was a German citizen, interned him in a concentration camp, where he is apparently still confined. By means of this happening, plaintiff ascertained the falsity of defendant's representation of his American citizenship. She has refused to live with him since that time, and thereafter she instituted this action for the annulment of her marriage.

The defendant's learned counsel urges that as the marriage was consummated, the German citizenship of the defendant did not go to the essence of the marriage relation, and did not affect the marital status. He argues that plaintiff lost nothing by her marriage to a non-citizen. In support of these contentions, he stresses the testimony of the plaintiff herself, to the effect that

she probably would have married defendant had he been a British citizen. It is true that plaintiff so testified under cross-examination. But she explained that the reason a citizen of Germany would not find favor in her heart was because of the dictatorship form of that country's government. This answers the earnest plea of defendant's counsel, that to grant plaintiff a decree of annulment would be equivalent to the judicial placement of a stigma upon a person because of his German citizenship, which would not be branded upon one of British citizenship. Plaintiff explicitly pointed out that her objection to defendant was not due to the fact that he was of German birth, but was based upon the fact that the government of his native land, to which he still owed allegiance, was totalitarian in form, whereas England's was democratic.

Our statute declares that " Marriage, so far as its validity is concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential." (Dom. Rel. Law, § 10.) The same law (§ 7, subd. 4) makes a marriage voidable where the consent of a party thereto was obtained by fraud. The right of action to annul a marriage on the ground that the consent of the plaintiff was fraudulently procured is conferred by section 1139 of the Civil Practice Act.

The earlier adjudications in this State tended to support the doctrine that a marriage could not be annulled for a fraudulent representation, unless it pertained to those rights and duties of cohabitation and consortium which the law attaches to the marital status. But in the case of *diLorenzo* v. *diLorenzo* (174 N. Y. 467) the Court of Appeals expressly held that the fraud need not necessarily deal with the essentials of the marriage *relation;* and that any fraud is sufficient to justify an annulment if it be " material, to that degree that, had it not been practiced, the party deceived would not have consented to the marriage " (p. 471), and if it be " of such a nature as to deceive an ordinarily prudent person " (p. 474). That principle prevails today. (*Shonfeld* v. *Shonfeld*, 260 N. Y. 477; *Beard* v. *Beard*, 238 id. 599; *Domschke* v. *Domschke*, 138 App. Div. 454.)

Our statute does not undertake to define what would constitute actionable fraud for purposes of annulment. Hence, as was said in *Shonfeld* v. *Shonfeld* (*supra*, at p. 479): " The court is left free to meet each case as it arises and to apply to the defendant's conduct the immemorial test of fair and conscientious dealing."

It has been noted that our statute declares marriage to be a civil contract It is, however, something more than that. It is a relationship which forms the basis of the family, and which

in turn constitutes the unit of the structure of our civilization. For that reason, the State, as a matter of public policy, is interested in preserving it. Its annulment for fraud will not be decreed where the false representation concerns a matter that has no more substance than a whim, caprice or fancy. The fact or situation to which it relates must be a material one, the existence of which may reasonably be calculated to affect the well-being of an ordinarily intelligent and prudent person. (*Shonfeld* v. *Shonfeld, supra,* at p. 481.) Was the defendant's false representation of his American citizenship, in the present case, of that nature? The answer to that question must be the key to the determination of this action.

In the *Shonfeld* case (*supra*) the Court of Appeals held that the plaintiff-husband was entitled to an annulment because of his wife's false representation that she possessed $8,000 which she would make available to him upon their marriage, to enable him to acquire an interest in a business enterprise.

In the case at bar the plaintiff's primary concern was that her husband be an American citizen. That was precisely what he falsely represented himself to be, in order to gain her consent to marriage. Here is a young woman filled with joyful pride over the fact that the roots of her family for generations have been planted in the soil of free and democratic America, who avails herself of her legal right to give her hand in marriage only to one who is himself a citizen of that same America. Was that a condition so capricious that the failure to conform to it may be overlooked? This court will not so hold.

The startling events which have been occurring on the international stage with such kaleidoscopic change and rapidity, emphasize the priceless privilege of American citizenship. In other nations, where democracy once flourished, it has withered under the tyranny of dictatorships more savage and more arrogant than the despotisms of medieval days. In those lands the culture of the human mind has been fettered by the mad ignorance of self-styled Fuehrers and Duces. Their people have been denied the freedom to speak and write their thoughts. They may hear and learn only those things which are ordered by their rulers. Paganistic materialism has been encouraged to supplant the moral precepts given to mankind on Mt. Siani, and which are bedrocked upon the Divine commandments to love God and to love thy neighbor. The Golden Rule has given way to the rule of gold. Might has taken the place of right. Justice is administered in star chamber, not on the basis of truth and equity, but by favor. Imprisonment and death have been imposed upon persons without

the formality of accusation. The worship of God according to one's conscience has brought the reprisal of death or of unspeakable torture worse than death. Property which had been fairly earned and saved by the individual's energy, honesty and thrift, has been confiscated. Honor has been exultingly betrayed, and deception has been exalted above verity. Personal liberty has been banished by the malevolent zeal of secret police. Labor is regulated by the lash of the slave-master. Human dignity itself has been debased. And these things have come to pass among those peoples because frenzied and frowning dictators have so willed it. There, the theory of government is that the individual is created to serve the State according to the arbitrary fiat of its head.

But here, in democratic America, the State was created by the people to serve them, not to enslave them or constrict their development. Here, the natural rights of freedom of speech and of the press, of freedom of worship, and of equality before the law, are guaranteed to every one by our Constitution. Not by virtue of his race, his color or his creed may these rights be denied to the humblest in the land; nor abridged save voluntarily by the people themselves. Life, liberty and the pursuit of happiness are the common heritage of all. The right of person and the right of private property are every man's possessions. They may be violated neither by the mightiest public executive nor by the lowliest village constable. Justice is meted out with impartiality, and is founded upon laws equally applicable to all. Condemnation of one charged with crime must be pronounced by a jury of his peers. Those who bear witness against him must confront him. His trial must be in public. Representation by counsel is assured to him, though he be lacking in private means. The gates of opportunity are opened so widely that all who wish may enter. The progress which one may make on its path is limited solely by his ability, industry and character. Spiritual values have not been depreciated by sordid standards. Truly the American — be he native-born or naturalized — may paraphrase the proud boast of the Apostle Paul and proclaim that he is a citizen of no mean country.

In the light of all these considerations, the plaintiff's insistence that her spouse must be an American citizen, cannot be regarded as the mere expression of a frivolous desire. In the case of *Truiano v. Truiano* (121 Misc. 635) the plaintiff-wife was awarded a decree of annulment because her husband falsely represented himself to be an American citizen. Defendant's counsel seeks to distinguish that case from the instant one on the ground that when the parties there were married, the Federal law then in force caused the wife

to lose her citizenship by her marriage to an alien; and also to lose her position as a public school teacher — to the holding of which citizenship was essential. He argues that since the enactment of the amendment which became effective on September 22, 1922 (U. S. Code, tit. 8, § 9), an American woman does not lose her status as a citizen by marrying an alien. That contention, of course, is sound. But it ignores the important right which the plaintiff in this case, under certain circumstances, may potentially lose by her marriage to defendant — and that is the right to bear children who themselves would be American citizens. Were plaintiff and defendant both citizens, and were children born to them while sojourning in a foreign land, such children would have the status of native-born American citizens. But that status is not accorded to children so born where the father is an alien. In such cases they would, in most instances at least, acquire the citizenship of their father.

In my opinion, principle and reasoning compel the conclusion that the false representation of American citizenship made by the defendant was a material one. It not only induced plaintiff's consent to marry him, but it was " adequate to induce it by offering a motive sufficient to influence the conduct of a [person] of average intelligence and prudence." (1 Bigelow on Fraud, 497.) Plaintiff's avowed objection to marriage with one who bears willing allegiance to the Nazi regime, finds support in the unhappy history which has been — and even now is being — written, by Nazism and its Fascist and Communist partners, with the blood and tears of millions of innocent, helpless, peaceably-disposed men, women and children; a history in which has been recorded the indiscriminate killing, not only of combatants, but as well of defenseless civilian populations in their homes and hospitals, and the bombing alike of religious temples and fortified works.

Judgment is directed in favor of the plaintiff annulling her marriage to the defendant, with costs. Submit decision and decree in accordance herewith.