JULIUS LEVY *vs.* HELEN LEVY.

Norfolk.    April 11, 1941. — May 28, 1941.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Marriage and Divorce,* Annulment. *Superior Court,* Jurisdiction. *Conflict of Laws. Fraud.*

The Superior Court had jurisdiction of a libel between parties domiciled here for annulment of a marriage contracted in another State.

The law governing nullity of marriage is that of the place where the marriage was contracted.

Ground under the law of New York for annulment of a marriage contracted there was not shown where the facts did not warrant a conclusion that the libellant as an ordinarily prudent man would be deceived by or have a right to rely upon false representations made by the libellee to induce the marriage.

LIBEL, filed in the Superior Court on November 1, 1938, for annulment of marriage.

The case was heard by *Baker,* J.

*M. Caro,* (*S. Z. Kaplan* with him,) for the libellee.

*H. Snyder,* for the libellant.

Dolan, J. This is a libel for annulment of a marriage. (G. L. [Ter. Ed.] c. 207, § 14.) The case was referred to an auditor, a demurrer filed by the libellee having been reserved for consideration by the judge until the hearing should be had on the merits of the libel. The case was heard upon the auditor's report, and certain affidavits and counter affidavits filed in connection with the libellee's motion to recommit the report, that of her attorney for counsel fees, and her motion for alimony *pendente lite*. After hearing, the judge denied the several motions before referred to, as well as motions of the libellee to strike certain findings from the auditor's report, and the motion that "judgment be entered" for her, and ordered that the libel for annulment be allowed. The libellee's exceptions to these actions of the judge bring the case before us.

Material facts found by the auditor may be summarized as follows: The parties first met in August, 1937, when the libellee, while standing on Harvard Street, Brookline, waiting for a street car, motioned to the libellant, who was seated in an automobile which was "stopped in traffic," and requested him to drive her to Commonwealth Avenue. He acquiesced. From that time on during that year they associated together on frequent occasions. On December 23, 1937, the libellant told the libellee that he was going to New York on a vacation. She suggested that she go with him. He consented and she "arranged for the transportation, which consisted of tickets for the boat to New York." On December 24, 1937, they travelled together on the boat to New York, and during the voyage had sexual relations. At that time the libellee employed a certain artifice, which need not be here described, to convince the libellant that, as she had previously represented to him, she was a "virgin." At some prior time she had told a third person that she intended to marry the libellant by "hook or crook," to make him believe that she was a virgin, and to that end to employ the artifice in question. Arriving in New York City they registered as man and wife at a hotel in which they occupied a room. The libellee informed the libellant that she was pregnant as a result of their relations, and said that she

could not go back to Boston unless he married her.  For two or three days she appeared to be hysterical and "threatened to jump out of the window unless the . . . [libellant] married her."  On December 31, 1937, the parties filed an application for a marriage license with the "New York State Department of Health," in which the libellee, who was thirty-seven years of age, represented her age to be twenty-nine years.  The libellant was then thirty-eight years of age, was president of an electric service corporation, and had accumulated over $5,000 in cash.  The libellant did not know that the libellee was thirty-seven years of age.  The parties were married in the city of New York on January 3, 1938, and returned to Boston on that day.  On March 15, 1938, they went to live together in an apartment in Brookline.  In the interim they had gone to New Hampshire for a week's vacation, during which time they occupied the same room.  They lived together in Brookline until late in May.  Prior to the separation the libellant had given the libellee $421 to pay for a "so-called engagement ring," and had turned over to her "by way of orders on banks" $4,550.42, a substantial part of which she used to purchase "furniture and other things connected with the housekeeping."  She had promised the libellant that she would "return to him on demand such money as was left after using it for said purpose."

When the libellee represented to the libellant that she was a "virgin" she had pending in the Superior Court four actions, in each of which allegations were made by her that one of the defendants had had intercourse with her with resulting pregnancy, and against other defendants that they had performed an abortion upon her at the persuasion of the first defendant without her knowledge or consent.  These actions were settled in September, 1938, after the libellant and libellee had separated, by the payment to her of $3,000.  She signed releases "in the name of Helen Bornstein" running to all the defendants.  She was not pregnant when she so represented to the libellant nor at any time thereafter to the conclusion of the hearings before the auditor in the summer of the year 1939.  Her

statement to the libellant in December, 1937, that she was a "virgin" was "knowingly and falsely" made. Although she intended to procure his "monies and properties" by means of the marriage, she intended to live with him as his wife, and subsequent to the marriage so lived with him and had intercourse with him. The finding of the auditor as to the reason why the libellant consented to marry the libellee is that "he feared that because of the pregnancy, she would commit suicide if he did not marry her." The parties at all times "had their place of domicil in Massachusetts." The auditor found and ruled that "Insofar as it . . . [was] within . . . [his] province . . . the law of Massachusetts is applicable to the facts . . . found" by him, and found for the libellee.

Since the parties were domiciled in Massachusetts the Superior Court had jurisdiction to entertain the libel. G. L. (Ter. Ed.) c. 207, § 14. *Hanson* v. *Hanson*, 287 Mass. 154, 156. Am. Law Inst. Restatement: Conflict of Laws, § 115. It is settled that, if the laws of this Commonwealth govern the determination of the case, the libellant cannot prevail since he had criminal intercourse with the libellee before his marriage to her. *Arno* v. *Arno*, 265 Mass. 282, 284, and cases cited. See also *Cassin* v. *Cassin*, 264 Mass. 28. It is also settled that, with certain exceptions based on public policy which do not affect the present case, the law governing nullity of marriage is that of the place where the marriage contract was entered into. *Commonwealth* v. *Lane*, 113 Mass. 458, and cases cited. *Cummington* v. *Belchertown*, 149 Mass. 223, 226. *Levy* v. *Downing*, 213 Mass. 334. *Hanson* v. *Hanson*, 287 Mass. 154, 156. *Van Voorhis* v. *Brintnall*, 86 N. Y. 18, 25, and cases cited. *Incuria* v. *Incuria*, 155 Misc. (N. Y.) 755, 758. Beale, Conflict of Laws, §§ 121.2, 136.1. Am. Law Inst. Restatement: Conflict of Laws, § 115, (1) comment b; § 136. It is the contention of the libellant that the facts found by the auditor constitute ground for the annulment of his marriage to the libellee under the law of the State of New York.

Section 1139 of the Civil Practice Act of the State of New York, so far as here material, provides as follows:

"An action to annul a marriage on the ground that the consent of one of the parties thereto was obtained by force, duress or fraud may be maintained at any time by the party whose consent was so obtained. . . . But a marriage shall not be annulled on the ground of force or duress if it appears that, at any time before the commencement of the action, the parties thereto voluntarily cohabited as husband and wife; or on the ground of fraud, if it appears that, at any time before the commencement thereof, the parties voluntarily cohabited as husband and wife, with a full knowledge of the facts constituting the fraud."

In support of the order of the judge that the libel for annulment be allowed, the libellant relies largely on *DiLorenzo v. DiLorenzo*, 174 N. Y. 467, and *Shonfeld v. Shonfeld*, 260 N. Y. 477. In the *DiLorenzo* case it was established by the facts that, prior to the marriage of the parties, the defendant falsely represented to the plaintiff that during a time when he was absent from the State she had given birth "to a male child, of which he was the father, [and] whom she exhibited to him as such," and that the plaintiff's consent to marry her was obtained by this fraudulent misrepresentation and stratagem which caused him to believe that he was the father of a child by the defendant. After the plaintiff discovered the falsity of these representations of the defendant, which was shortly before the commencement of the action to annul the marriage, he had not cohabited with her. In holding that the plaintiff was entitled to prevail the court said that one of the causes for annulment of marriage set forth in the Code of Civil Procedure is that "the consent of one of the parties was obtained by force, duress, or fraud," and that "the only limitation imposed, where the action is on the ground of fraud, is that it must appear that the parties have not, at any time before the commencement of the action, 'voluntarily cohabited as husband and wife, with a full knowledge of the facts constituting the fraud'" (page 471). At pages 472 and 473 the court said: "The free and full consent, which is of the essence of all ordinary contracts, is expressly made by the statute necessary to the validity of the marriage contract. The minds of the

parties must meet in one intention. It is a general rule
that every misrepresentation of a material fact, made with
the intention to induce another to enter into an agreement
and without which he would not have done so, justifies
the court in vacating the agreement. It is obvious that
no one would obligate himself by a contract, if he knew
that a material representation, entering into the reason for
his consent, was untrue. There is no valid reason for ex-
cepting the marriage contract from the general rule. In
this case, the representation of the defendant was as to a
fact, except for the truth of which the necessary consent
of the plaintiff would not have been obtained to the mar-
riage. It was designed to create a state of mind in the
plaintiff, the operation of which would be to yield a consent
to marry the defendant, in the belief that he was rectifying
a great wrong. The minds of the parties did not meet upon
a common basis of operation. The artifice was such as to
deceive a reasonably prudent person and to appeal to his
sense of honor and of duty. The plaintiff had a right to
rely upon the defendant's statement of a fact, the truth of
which was known to her and unknown to him, and he was
under no obligation to verify a statement, to the truth of
which she had pledged herself. It was a gross fraud and,
upon reason, as upon authority, I think it afforded a suf-
ficient ground for a decree annulling the marriage con-
tract." The *Shonfeld* case was not concerned with any
misrepresentations as to chastity or pregnancy, but as to
the "fortune" of the libellee, and in essence the governing
principles of law laid down in the *DiLorenzo* case were ad-
hered to by the court. In the *Shonfeld* case, at page 481,
the court said: "If the proof shows that the representa-
tions were of a nature to deceive an ordinarily prudent man
who, but for the representations, would not have consented
to the marriage, there is adequate basis for a decree. The
primary consideration in every case is the materiality of
the representation viewed in the light of all circumstances
by the mind, not of the individual plaintiff but of an ordi-
narily prudent man." [1]

---

[1] See Annulment of Marriage for Fraud in New York, Drexler, 71 U. S.
Law Review, 318.

Applying these principles to the present case we are of opinion that, on the facts, it could not be found properly that the representations and artifice employed by the libellee were such as to deceive an ordinarily prudent person, and hence not such as he would have a right to rely upon. The auditor has not found that the libellant married the libellee in reliance upon her representations that she was chaste and, in our opinion, the facts found would not warrant an inference by the judge that as an ordinarily prudent man the libellant would be warranted in so doing. In view of the manner of the meeting of the parties, the arrangement by the libellee with the consent of the libellant for the passage on the boat by which they travelled together to New York, and in the progress of which they had intercourse without, so far as appears, any intention or talk of marriage, we think that it could not be found properly that the libellant as an ordinarily prudent man would be deceived by and have a right to rely on these representations and the artifice employed as an inducement to marriage.

The auditor found, as before set forth, that the libellant married the libellee because "he feared that because of the pregnancy, she would commit suicide." The subsidiary facts found by the auditor, however, disclose that the parties first had sexual relations on the boat trip to New York on or about December 24, 1937. When they arrived in the city of New York they occupied the same room in a hotel. It was there that the libellee "informed the . . . [libellant] that she was pregnant by reason of the intercourse he had had with her; [and] that she could not go back to Boston unless he married her." For two or three days she was hysterical and threatened to jump out of the window. unless he married her. The application for the marriage license was filed on December 31, 1937. It thus appears that the representations of pregnancy were made by the libellee if not upon the arrival of the parties at the hotel, then, at the latest, not more than three or four days after they had had intercourse for the first time. In these circumstances we are of opinion it could not properly be found

that this representation was "of a nature to deceive an ordinarily prudent man who, but for the representations, would not have consented to the marriage." *Shonfeld* v. *Shonfeld*, 260 N. Y. 477, 481.

It follows that the order of the judge that the libel for annulment be allowed was erroneous.

The disposition of the motion of the libellee's attorney for counsel fees and of the libellee's motion for temporary alimony rested in the discretion of the judge. No exception lies to their denial. It is unnecessary to consider other exceptions of the libellee.

The libellee's exception to the order of the judge that the libel for annulment be allowed is sustained; and a decree is to be entered dismissing the libel.

*So ordered.*