JAQUELINE KOBER, Respondent, *v.* JOSEF KOBER, Appellant.

First Department, February 18, 1965.

*Eli H. Bronstein (Henry G. Van Veen* with him on the brief), for appellant.

*Dino Cerutti* for respondent.

BREITEL, J. P.  In an action for annulment defendant husband appeals from an order denying his motion to dismiss the second cause of action on the ground of legal insufficiency (CPLR 3211, subd. [a], par. 7).  The gravamen of the second cause of action is that defendant husband falsely and fraudulently concealed from plaintiff wife prior to the marriage that during World War II he had been an officer in the German army and a member of the Nazi party.  The allegations spell out that defendant husband is a Nazi and anti-Semitic and that his views persisted through the marriage and would have required plaintiff wife to terminate relationships with all her Jewish friends.  There is no allegation that the wife is Jewish.  She is a resident of New York and evidently an American although this is not alleged.

The order should be reversed and the motion granted.  Marriages are annullable only for frauds vital to the marriage relationship.  The frauds alleged in the second cause of action do not fall within the doctrine.

According to the complaint the parties were married June 28, 1963.  Plaintiff wife was then a widow with three children.

Defendant husband had also been married before and had one child. The other causes of action contained in the complaint and which are not involved in the present appeal seek an annulment on the ground that defendant husband was at the time of the instant marriage still married to his first wife, that he misrepresented his capacity and intention to support his new family, that he wrongfully appropriated to himself a valuable camera belonging to plaintiff wife, that he misrepresented his intention of paying for a European trip for plaintiff wife and her children, and that he wrongfully misappropriated passage money advanced by the wife.*

It is true that over the years the rule in New York with regard to annulment of marriages for fraud based on misrepresentations has been broadened. Originally the rule was restrictive and confined the ground for annulment to those facts which were directly related to cohabitation and consortium. In later years the rule was extended to embrace other kinds of fraud (see, generally, 16 N. Y. Jur., Domestic Relations, §§ 845–866; 55 C. J. S., Marriage, § 34, subd. b). The cases are collected and discussed in *Woronzoff-Daschkoff* v. *Woronzoff-Daschkoff* (303 N. Y. 506). In that case it was made clear, however, that the broadening of the rule did not mean that the agreement to marry would be treated like any commercial agreement subject to nullification for any inducing fraudulent misrepresentation. On the contrary, DESMOND, J., now Chief

---

\* The pertinent allegations in the second cause of action read as follows:

"9. That at and before the aforesaid marriage of the parties hereto the defendant falsely and fraudulently concealed from the plaintiff that during World War II he had been an officer in the German Army and a member of the Nazi Party with a party number; that he hated and detested the Jewish people and was fanatically anti-Semitic; that he believed in, advocated, approved and even applauded Hitler's 'Final Solution' of the Jewish question, namely the extermination of the Jewish people; and that he would require plaintiff to 'weed out' all of her Jewish friends and to cease socializing with them.

"10. That plaintiff married defendant believing him to be a man of high moral character and without taint of Naziism and fanatic anti-Semitism, without having been a member of the Nazi Party and without the belief that the Jewish people should be exterminated, all of which he had at the date thereof, and during the marriage and all of which he expressed after and during the marriage so as to make the marital relationship unworkable.

"11. That plaintiff relied on the defendant's apparent normal character, high moral beliefs and absence of fanatic anti-Semitism and would not have married him had she known prior to the aforementioned marriage that the defendant had been a member of the Nazi Party, was fanatically anti-Semitic, believed that all Jews should be exterminated, and that he would require plaintiff to cease socializing with all her Jewish friends, and had the defendant not been guilty of said fraudulent concealment."

Judge, on behalf of the court emphasized, because of the special status the marriage relationship had in society, that distinctions would have to be made between the kind of frauds which are "vital" to the marriage and those which are not (p. 511). An examination of cases in this area demonstrates this to be doctrine that has always been applied even after the liberal statement of the rule in *Shonfeld* v. *Shonfeld* (260 N. Y. 477), even with respect to matters of premarital continence, prior illicit relationships, intentions to change religion, and many more (16 N. Y. Jur., Domestic Relations, §§ 845–861).

To be sure, the marriage relationship and the courtship which precedes it cannot be treated in the same way as a commercial contract and the negotiations which precede it. The very intimacy of the relationship precludes the external application of a rule which would require of all that there be a complete revelation of every significant incident in one's past and of every psychological datum in one's mind. A corollary is that the very purpose of the courting relationship preceding marriage is the discovery of the external facts and psychological character of the persons involved.

It is not that a *caveat emptor* rule is to be applied; that would be even more unnatural. It is that in such an intimate relationship contemplating persistence for a lifetime and based on the adjustment (not the conformity) of two complete and different personalities, all the commercial contract analogies are of little value. The courtship is a riskful exploration of the possibilities of adjustment and not a baring of every private thought or historical datum.

Apart from the nature of the courting relationship there is a policy consideration of the greatest significance. If the ground for fraud is broadened in analogy to the rule applicable to contractual relationships the opportunities and occasions for obtaining annulments on asserted but nonexistent grounds would become uncontrollable. It is signigficant too, in this context, that one is concerned only with annulment and not with the grounds for marital separation. Thus, many fraudulent misrepresentations, not sufficient to ground an annulment, would be sufficient to warrant relief by way of separation if the consequences of the fraud are projected into postmarital conduct. There is no doubt that the limited ground on which a divorce may be obtained in this State produces pressure to extend the action for annulment to embrace more than it normally would or logically should. The trouble is the extension plaintiff wife seeks would also unleash an uncontrollable mass of collateral problems and effects.

In this instance plaintiff wife relies on the extreme and horrible character of the husband's past and present beliefs in areas not directly affecting the vital elements of the marriage relationship between the husband and wife. Views less extreme than those attributed to the husband might require a wife, in order to preserve marital harmony, to give up friendships which she had made in the past. And, of course, the converse is also true, that a spouse may have to suppress his views or give up his friends or some of them, in order to preserve marital harmony. These are matters of private, complicated adjustment, generally not determined by rule of law or even morals. Indeed, the truth of marital adjustment is a surrender of many rights and privileges, often for insufficient reason from the point of view of the outside beholder who has no concern with the relationships. It is a matter of common experience that with many people the pattern of friendship changes rapidly following marriage because of the justified or unjustified views and idiosyncrasies of one spouse or the other. To be sure, the extremeness of the husband's views stretches the principle but it also tests the fact that the law could not lay down a viable line of separation between political and philosophical views too extreme to be concealed during the courting relationship from those not so extreme which may be concealed intentionally or inadvertently without impairing the agreement to marry.

What has been said thus far, however, should not and does not preclude the parties to a proposed marriage by their conduct from making various material circumstances vital to the engagement to marry. Thus, one who, for whatever reason, is especially concerned in some aspect of the history or personality of a prospective spouse and makes investigation or direct inquiry concerning that aspect might well be able to obtain annulment because of deliberate falsehood or concealment designed to deceive the other (*Shonfeld* v. *Shonfeld,* 260 N. Y. 477, *supra*; *Laage* v. *Laage,* 176 Misc. 190).

Plaintiff wife relies on the recent decision of this court in *Sophian* v. *Von Linde* (22 A D 2d 34). That decision does not support plaintiff wife's argument. In the *Sophian* case Mr. Justice STEUER on behalf of the court noted the shifting of the fraud rule in annulment cases from the historically more restrictive doctrine to the present more liberal one. At the same time it was observed that the fraud rule is not equivalent to that which applied in commercial transactions. The facts in the *Sophian* case are, of course, markedly different from those here. In the *Sophian* case defendant husband by affirmative elaborated misrepresentation gave himself a name and history

which, if true, would have made him a person of descent and upbringing derived from German nobility. He also was found guilty of having misrepresented his intention of consummating the marriage. A second cause of action based on the husband's homosexuality was dismissed for lack of proof, but without prejudice under the modification in this court, because the proof consisted of only one act of homosexuality committed some 16 years prior to the marriage. In short, in the *Sophian* case the first fraud constituted a misrepresentation of identity and the other a misrepresentation of a purpose vital to the marriage, and available as a ground of fraud even under traditional restrictive doctrine.

It may well be that under some circumstances, not alleged in this complaint, even without affirmative inquiry by the one prospective spouse or affirmative misrepresentation by the other, a duty would arise on the part of one courting another or being courted, to make a disclosure of facts where generally there would be no duty to disclose. This case, for an example, would be quite different, if the parties had been very young, and the courting had occurred while the war was still on (if that had been possible), and the woman was employed in the war-essential public service or was the daughter of one so employed, especially in high rank. What would then change the situation is not the fact alone of the husband's political views, but the circumstances of currency of his views and status, the special situation of the young woman, and the obvious and unmistakable duty to speak out. The duty to speak would arise because the concealed facts under the special circumstances affected vital elements of the proposed marriage, and, indeed, the possibility of the marriage continuing without destruction of the status of the injured spouse or those intimately related to her.

Accordingly, the order denying defendant husband's motion to dismiss the second cause of action should be reversed, on the law, without costs or disbursements to either party, and the motion granted.

RABIN, J. (dissenting). I dissent and vote to affirm. In denying defendant husband's first motion to dismiss the second cause of action, Special Term said in part as follows:

" The second cause of action alleges that defendant deliberately concealed from plaintiff that he was a Nazi and hated Jewish people and was fanatically anti-semitic; that he believed in, advocated, approved and applauded Hitler's ' Final Solution ' of extermination of the Jewish people and that he would require plaintiff to weed out her Jewish friends and cease socializing with them.

" These are more than distasteful beliefs; they are absolutely repugnant and insufferable to all persons who believe in the divine nature of man. A fraud with respect to such beliefs, inducing marriage, is one affecting a vital aspect of the marital relationship. At least, it may be so determined upon a trial. It might well be found to be ' material to that degree that, had it not been practiced, the party deceived would not have consented to the marriage ' and is of such a nature as to deceive an ' ordinarily prudent person ' (*Di Lorenzo* v. *Di Lorenzo,* 174 N. Y. 467, 471, 473; *Shonfeld* v. *Shonfeld,* 260 N. Y. 477)."

I quite agree that the fraud alleged is such as would affect " a vital aspect of the marital relationship ". The holding of such beliefs, and carrying them into the marital relationship, could very well make impossible the maintenance of the marriage if those beliefs are repugnant to the wife's very nature. That being so, fraudulent concealment of those beliefs before marriage should support a judgment of annulment.

McNALLY, STEUER and STALEY, JJ., concur with BREITEL, J. P.; RABIN, J., dissents in opinion.

Order, entered on August 7, 1964, reversed, on the law, without costs or disbursements to either party, and the motion to dismiss the second cause of action granted.