(30 App. Div. 447.)

WENDEL v. WENDEL.

(Supreme Court, Appellate Division, Second Department. May 24, 1898.)

1. MARRIAGE—WHO MAY MARRY—PHYSICAL CAPACITY.
　　The possession of the organs necessary to conception cannot, as matter of law, be held essential to capacity to enter into the marriage state, under Code Civ. Proc. § 1743, so long as there is no impediment to the indulgence of the passions incident to this state.

2. SAME.
　　In this respect there is no essential difference between a woman who, through no fault of her own, has lost her ovaries through a surgical operation, and one who has suffered the same result through the operation of nature.

3. SAME—ANNULMENT—GROUNDS.
　　An action to annul a marriage, brought by the husband, cannot be maintained on the ground that the marriage was induced by the defendant's fraud in concealing her physical incapacity to bear children, where it appears that she frankly stated to him all the facts within her positive knowledge, and put him in a position to obtain exact information, and where it does not appear that the desire for offspring formed any material part of the inducement to his marriage.

4. SAME—WAIVER.
　　The fact that husband and wife continue to cohabit as such after he learns that her ovaries had been removed before their marriage, deprives him, under Code Civ. Proc. § 1750, of any right to have the marriage annulled on the ground of fraud.

Appeal from special term, Kings county.

Action by Joseph Wendel against Louise Wendel.  From a decree for plaintiff (49 N. Y. Supp. 375), defendant appeals.  Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, and WOODWARD, JJ.

Gustave Hurlimann (James C. Foley, on brief), for appellant.
Thomas Kelly, for respondent.

WOODWARD, J.   The parties to this action were married on the 22d day of June, 1896, in the city of New York, living together as husband and wife at 35 Central avenue, in the city of Brooklyn, until the 13th day of March, 1897, when the defendant left the home of the plaintiff owing to cruel treatment.   The plaintiff was a widower, with four children, and was conceded on the argument to be about 60 years of age at the time of the marriage, while the defendant was a widow, with one child, and conceded to be slightly under 40 years of age.   At the time of the birth of her child the defendant underwent a surgical operation, by means of which her ovaries were removed.   This fact was not disclosed to the plaintiff, although he admits that she did disclose to him that she had submitted to a serious surgical operation, and that she told him, before the marriage ceremony, that she did not know for certain whether she would be able to bear children or not.   The learned trial court found as facts, among other things, that "for the purpose of inducing the plaintiff to marry her, the defendant falsely and fraudulently represented to him that she was in fit physical condition to enter into the marriage state, and that, relying upon said representations, and believing them to be true, this plaintiff married defendant; that said representations as to the physical condition of said defendant were false and untrue when she made same; that her ovaries had been cut out and removed a long time before said marriage; that defendant was then, for a long time prior had been, and has ever since remained, physically incapable of entering into the marriage state, or of consummating said marriage; that, in consequence of her ovaries having been removed, it is impossible for the defendant to conceive, become a mother, or to enter into the marriage state"; and because of these facts the court concludes that as a matter of law the "plaintiff is entitled to a decree annulling the marriage between the plaintiff and the defendant, freeing each of them from all obligation thereunder, and that said marriage is null and void, and of no force or effect."   The decision of the learned court is based apparently upon the provisions of section 1743 of the Code of Civil Procedure, which provide that an action may be maintained to procure a judgment declaring a marriage contract void and annulling the marriage when, among other things, one of the parties was incapable of entering into the marriage state at the time of the marriage.   The court held that because of the loss of her ovaries the defendant was incapable of conception, and, therefore, of "entering into the marriage state"; and, while this conclusion is in harmony with those higher ideals of the marriage state which ought not to be disturbed except upon grave considerations of public policy, we are forced to conclude that the learned trial court has not fully considered the

effect of such a rule, and that it ought not to receive the sanction of this court. It is a fact well known to medical science, and familiar in our common experience, that every woman passes through a climacteric period, usually between the ages of 40 and 50 years, after which she is incapable of conception, and yet it has never been suggested that a woman who has undergone this experience is incapable of entering the marriage state, or that she is guilty of any fraud in contracting marriage. In this latter case the ovaries are shrunken and contracted to a point where they no longer discharge the functions necessary for conception, and, in so far as the reproduction of the species is concerned, the one is as incapable of "entering into the marriage state" as the other. There is no essential difference between a woman who, through no fault of her own, has lost her ovaries through a surgical operation, and one who has suffered the same result through the operation of nature; and, if the one is incapable of entering into the marriage state, we can conceive of no process of reasoning by which the other may be said to be capable. It seems to us clear, therefore, that it cannot be held, as a matter of law, that the possession of the organs necessary to conception are essential to entrance to the marriage state, so long as there is no impediment to the indulgence of the passions incident to this state. There is no evidence in the case at bar to indicate that there was any defect in the defendant aside from her incapacity to conceive; and, although the plaintiff alleges that he discovered the loss of the ovaries on the first night after the performance of the marriage ceremony, there is nothing to indicate that he made any complaint, or that he refused to cohabit with her, or to live with her as his wife. On the contrary, it is not disputed that he continued to cohabit with her until she became too ill with a fever to longer indulge him.

If the defendant was not incapable of entering the marriage state, —and we are satisfied that she labored under no such disability,— the only remaining question to be considered is whether she was guilty of fraud in not pointing out her exact condition upon being questioned by the plaintiff. The evidence is that the plaintiff asked her in reference to her condition, and that "she declared to me that she had undergone an operation in her home in Basle; that Professor Bischoff, who had operated on her, was such a thorough and skillful physician that nothing was left with regard to any bad effect after the operation. After that, upon the 8th of June, 1896, I went to her again, and I asked her whether she could be a wife to me and the family, whether she could be a helpmate and assistant to me, and whether she was physically and mentally capable of being a wife. And she said to me that she was physically and mentally healthy. She told me what the operation in Basle was. She said that she gave birth to a boy, and in giving birth to the boy it was necessary to perform the Cæsarean operation in order to have him born alive." On cross-examination he was asked if Mrs. Wendel did not tell him that she would not have any children. He replied, "Not at this time, before the engagement. but after that she told me she did not know certain whether she would be able to bear children or not." This is the plaintiff's own evidence, and there is nothing in the case

to indicate that the defendant did not make an absolutely frank and honest reply to the questions asked. There is no evidence, with the exception of the admission of the defendant, on information and belief, that the defendant's ovaries have been removed; nor is there room for the presumption that she was aware of the loss of these organs, or of her incapacity for conception, at the time she made the statement which the plaintiff testifies to. These operations are usually performed under the influence of an anæsthetic, and the extent of the operation is not, therefore, within the personal knowledge of the patient; nor is it customary, under all circumstances, to inform her. If the operation had resulted only in the removal of one of the ovaries, the power to conceive would not have been destroyed, and it is fair to assume that when the defendant told the plaintiff that she was not sure as to her capacity to bear children, she stated the exact truth to the best of her knowledge and belief; at least there is no evidence on which the contrary assumption may be based. It does not appear from any evidence in the case, nor from the character of this plaintiff, that he was actuated solely by a desire for offspring, or that this formed any material part of the obligation of the contract of marriage, for the result shows that he persisted in his intention of marrying the defendant after she had given him notice of the doubt which existed of her capacity for maternity; and, although he alleges that he discovered the defect on the first night after the ceremony, all of the testimony goes to show that he continued to cohabit with the defendant for a period of several months, and until she became too ill to minister to his passions. "Whenever fraud is relied on as the ground of invalidating a contract," say the court in the case of Foss v. Foss, 12 Allen, 26, "it is material not only to prove false and fraudulent representations, but also that they were made under such circumstances as to lead to a reasonable inference that a party was thereby deceived and induced to enter into the contract which he seeks to avoid. If it appears that he had the means of ascertaining the falsity of the statements made to him, or that the nature of the transaction and the circumstances attending it were such as to put a reasonable person on inquiry, the presumption of deceit arising from proof of the fraud will be repelled, and the party will be left to bear the consequences of his own want of due diligence and caution. A party cannot escape from obligations which he has voluntarily assumed, on the ground that he has been deceived and defrauded, if he neglects to avail himself of means of information within his reach, or if he places a blind or willful confidence in representations which were not calculated to deceive a man of ordinary prudence and circumspection, for, although he may have been in point of fact deceived and imposed upon, yet it is a consequence or result of his own folly or neglect." It is undisputed—indeed, the plaintiff himself alleges—that he was made aware of the fact that the defendant had undergone a serious surgical operation. He was given the name of the physician who performed the operation, and the defendant told him that she was in doubt as to her capacity to bear children; yet with all these facts before him the plaintiff entered into a contract of marriage with the defendant, who, in so

far as the evidence throws any light upon the subject, discharged all of the obligations which this contract imposed upon her. It was no part of the contract that she should bear children. "Mere sterility can in no case form a sufficient ground for a decree of nullity," say the court in the case of Devanbagh v. Devanbagh, 5 Paige, 553; and while the policy of the law undoubtedly contemplates the possibility and the probability of issue, it cannot be held as a matter of law that the physical incapacity to conceive is a bar to entering the marriage state." "Without examining fully into all the cases upon this subject," say the court in Fisk v. Fisk, 6 App. Div. 432, 39 N. Y. Supp. 537, "it may be sufficient to say that the rule is well settled that no fraud will avoid a marriage which does not go to the very essence of the contract, and which is not in its nature such a thing as either would prevent the party from entering into the marriage relation, or, having entered into it, would preclude performance of the duties which the law and custom impose upon the husband or wife as a party to that contract. 1 Bish. Mar. & Div. §§ 183, 184; Schouler, Husb. & Wife, § 27; Reynolds v. Reynolds, 3 Allen, 605. Within that rule it has been held that fraudulent representations of one party as to birth, social position, fortune, good health, and temperament do not vitiate the contract. * * * If, when the relation is entered into, the party is competent to make that contract, is mentally competent to do the duties which the contract involves, and physically able to meet its obligations, nothing more can be required; and, however the other party may be disappointed as to physical or mental characteristics which he or she expected would exist, such disappointment is no ground for setting aside the contract, which the public good requires should be rendered indissoluble except for the gravest reasons." But assuming, for the sake of the argument, that this defendant had been guilty of fraud upon the plaintiff, we are still of the opinion that the judgment of the trial court ought not to be sustained. Section 1750 expressly provides that a marriage shall not be annulled on the ground of fraud if it appears that at any time before the commencement of the action "the parties voluntarily cohabited as husband and wife, with a full knowledge of the facts constituting the fraud." The plaintiff does not deny that such cohabitation took place after the time that he alleges he discovered the alleged physical defects in this defendant, while the defendant states that such relations continued until December of the year in which they were married. This rule has always prevailed in the practice of this state, and it is based upon considerations of justice and public policy which ought not to be overlooked in dealing with questions of this character. Scott v. Shufeldt, 5 Paige, 42; Reynolds v. Reynolds, 3 Allen, 605.

The judgment is reversed, and a new trial granted; costs to abide the event.