JOHN HENRY McGILL, Plaintiff, *v.* ESTHER B. McGILL, Defendant.

(Supreme Court, Onondaga Trial Term, February, 1917.)

Marriage — annulment of — when court of equity may annul a — actions — Code Civ. Pro. § 1750.

A court of equity may annul a childless marriage for fraud on proof that the defendant, who long prior to and at the time of the marriage was an incurable epileptic, not only concealed the fact from plaintiff but led him to believe that she was in

good health, and that but for such concealment and misrepresentation plaintiff would not have married her.

The provision of section 1750 of the Code of Civil Procedure that a marriage shall not be annulled on the ground of fraud if it appears that at any time before the commencement of the action to annul the parties voluntarily cohabited with a " full knowledge of the facts constituting the fraud " means knowledge of which there can be no question.

Plaintiff, upon discovery of his wife's epilepsy, was under no legal necessity or duty to abandon her, but was legally bound to care for her until a court of equity annulled the marriage, and that he cared for and continued to live with her in the same apartment, but without cohabiting with her, did not preclude his right to bring the action.

ACTION for annulment of marriage on the ground of fraud.

L. T. Fetzer (William F. Canough, of counsel), for plaintiff.

Madden & Jordan, for defendant.

Ross, J. The husband sues to annul the marriage upon the ground that he was induced to enter into the marriage contract by the defendant's concealing from him that she was an epileptic, and in leading him to believe through statements to that effect that she was in good health.

It was proved that, at the time of the marriage, the defendant was, and for some time prior thereto had been, afflicted with epilepsy, and she has been ever since an epileptic. The parties were married March 9, 1912, in Syracuse. The defendant refused to join her husband that night, and he remained at his room at the hotel, and she remained at her home. The following night the plaintiff returned to his home in New York city. On March twenty-third, the defendant came to

New York, accompanied by her aunt, the witness, Mrs. H. Lepper. A few days later the defendant was taken ill in her room, and the aunt refused to allow the plaintiff to enter. After a time, having gained admission, he found his wife lying on the bed, very pale and unable to talk. In April, the parties went to Stamford, Conn., and lived there until about June first with the plaintiff's parents. About June first they returned to New York. In September, the defendant became pregnant, and early in December, either there was an abortion performed upon her, or she had a miscarriage. During the time the parties lived together, the defendant had frequent attacks of illness, or, what has been termed in the evidence by some of the witnesses, fits; which, in the light of all the evidence, were undoubtedly epileptic seizures. While in Stamford, Conn., the defendant was attended by one Dr. Cloonan, and later in New York by one Dr. Porter, and subsequently by Dr. Solley. The plaintiff testifies that the first time he knew that his wife had epilepsy was on December 12, 1912, when he was so informed by Dr. Solley; that after that time he did not cohabit with the defendant; that he continued to live with her and slept in the same room as there were only two rooms in the apartment, and he continued to care for her until she went to Craig Colony on April 15, 1915. There is no living issue of the marriage.

Counsel have cited no case in this state wherein the action to annul a marriage was based upon the defendant's being an epileptic. The recent decision of *Elser* v. *Elser,* 160 N. Y. Supp. 724, is such a case, and will be referred to further on.

I have no hesitation in finding that the defendant, at the time of her marriage and for a long time before, was an epileptic, and so far as medical science can

determine is incurable; and that the defendant and her aunt not only concealed such fact from the plaintiff but misrepresented her condition; that but for such concealment and misrepresentation the plaintiff would not have entered into the marriage contract.

With reference to what occurred after the marriage to call his attention to the disease from which his wife was suffering, we must not be too strict in extending the doctrine of constructive notice to the case of a lover zealously courting the woman of his choice or to an anxious husband earnestly seeking to ascertain the cause of his wife's illness and to cure the same.

Section 1750 of the Code of Civil Procedure, which empowers the court to annul a marriage on the ground of force, duress or fraud, provides as follows: " But a marriage shall not be annulled * * * on the ground of fraud, if it appears that, at any time before the commencement thereof [*i. e.,* the action to annul], the parties voluntarily cohabited as husband and wife, with a full knowledge of the facts constituting the fraud."

The meaning of this provision clearly appears in the case of *Wendel* v. *Wendel,* 30 App. Div. 447. This was a case in which the defendant had her ovaries removed by a surgical operation. It appeared that she informed her husband before her marriage that she had undergone a surgical operation which made it doubtful whether she had capacity to bear children; that the plaintiff alleged that he discovered the loss of the ovaries on the first night after the performance of the marriage ceremony, and that thereafter he continued to cohabit with her until she was too ill with the fever to longer indulge him. In the case cited, there can be no question that the plaintiff voluntarily cohabited with his wife with a full knowledge of the facts which

he claimed constituted the fraud. In the case under consideration, under a reasonable interpretation of the evidence, can it be said that the defendant had a full knowledge of the facts constituting the fraud until December 12, 1913, when he was first told by a physician that his wife had epilepsy? Certainly, from that time on, the evidence does not justify a finding of a voluntary cohabitation with the defendant. Let us test this situation by the ordinary rules of human conduct which govern the conduct of a man of average intelligence and moral sensibility. This young man, in March, marries the woman of his choice. It is true that there were rumors that the defendant, to whom he was engaged to be married, was subject to epileptic seizures, but he was assured by her that this was not true, and the evidence of the conversations had with her and her aunt with whom she lived, and the visit to Dr. Mooney, all point to the conclusion that it was the defendant's purpose, in which she succeeded, to deceive his as to her actual condition; that after the marriage she had, from time to time, attacks which probably were epileptic seizures, and he procured at different places where they resided and at different times the best medical advice that he could afford, and to him was obtainable; and that none of these men, until December, told him that she was subject to epileptic seizures. The plaintiff testified on cross-examination that prior to the time he consulted Dr. Solley in December, 1912, he thought the fits which the defendant had were hysterical, and that after he consulted with the doctors he thought they were not epileptic.

Dr. William M. Trader, one of the staff of physicians at Craig Colony, a witness for the defendant, said on cross-examination that the appearance of a patient suffering from an attack of hysteria and suf-

fering from an attack of epilepsy is somewhat similar, and that the distinction would not be apparent to an ordinary lay observer.

As presumably a faithful husband, he was endeavoring to do his whole duty to effect a cure from whatever disease she was suffering. It is evident from the language of the Code that the words " full knowledge " mean something more than the ordinary notice which may be inferred from circumstances; it means, as illustrated in the *Wendel* case, a knowledge about which there can be no question. We must bear in mind " that a full knowledge of the facts constituting the fraud " means, not only knowledge of the disease, but knowledge of the facts constituting the fraud, knowledge that the defendant had epilepsy at the time of her marriage, and that she then knew that fact.

In this case, the most important contract which a man can make, affecting his whole life, was based upon fraud, and a court of equity ought not to be zealous in endeavoring to sustain a contract with such a foundation, and the language of the Code should prevent the court from extending the rule of constructive notice applicable to the case of the notice a master should have of the safety of the appliances used in the prosecution of his business, and the knowledge which is sometimes inferred against a person who is dealing with a trustee as to the character of the transaction, to the case of a zealous lover or a faithful husband.

With reference to the claim that he cohabited with his wife after the discovery in December, 1912, that she had epileptic seizures, no question of construction is involved in this, for I have no hesitation in finding that he did not cohabit with her at all. He cared for her as well as his circumstances permitted, and pro-

cured, as soon as he could, her commitment to a proper institution for treatment. He was under no legal necessity or duty to abandon her, but was under the legal duty of caring for her until such a time as that duty should be terminated by the action of a court of equity.

*Svenson* v. *Svenson,* 178 N. Y. 54. This was an action brought to procure an annulment of the marriage between the plaintiff and defendant on the ground of fraud in that the defendant, at the time of the marriage, was suffering from a chronic and contagious venereal disease, which he concealed from plaintiff. In that case the marriage was not followed by cohabitation as man and wife. It appears that the defendant had, before the trial, recovered from the disease. As bearing upon the attitude of the courts towards marriages procured by fraud, the following excerpts from the opinion are instructive. On page 57, Mr. Judge Martin, writing for the court, says: "Obviously the principle that refuses relief in cases of ordinary ill-health after the marriage contract has been actually consummated has no application to a case like this, where there has been no consummation and the disease is one involving disgrace in its contraction and presence, contagion in marital association, and includes danger of transmission and heredity that even science cannot fathom or certainly define. The suppression of the presence of a disease including such dire and disastrous possibilities, directly affecting the marital relation, constitutes a fraud which clearly entitles the innocent party to a decree annulling the marriage contract, particularly when it has not been *consummated.* ' Marriage begins by contract and results in a *status.* If, before children are begotten, before debts are created, real estate involved, and the

community have long recognized the relation, the injured party seeks relief from fraud, error or duress, it seems clear that no consideration of public policy will prevent a court from annulling a marriage where the relation has not fully ripened into the complications of a public *status*. In such case the marriage is but little more than a contract; and, in view of the serious consequences to follow, the degree of fraud which vitiates a contract should be sufficient.' "

In the case of *di Lorenzo* v. *di Lorenzo,* 174 N. Y. 467, on page 472, the court says: " While, then, it is true that marriage contracts are based upon considerations peculiar to themselves and that public policy is concerned with the regulation of the family relation, nevertheless, our law considers marriage in no other light than a civil contract. The free and full consent, which is of the essence of all ordinary contracts, is expressly made by the statute necessary to the validity of the marriage contract. The minds of the parties must meet in one intention. It is a general rule that every misrepresentation of a material fact, made with the intention to induce another to enter into an agreement and without which he would not have done so; justifies the court in vacating the agreement. It is obvious that no one would obligate himself by a contract, if he knew that a material representation, entering into the reason for his consent, was untrue. There is no valid reason for excepting the marriage contract from the general rule."

*Sobol* v. *Sobol,* 88 Misc. Rep. 277. Annulment action tried before Mr. Justice Blanchard. The fraud claimed was that the defendant had tuberculosis and concealed that fact from the plaintiff, and misrepresented the facts as to his health. The learned justice, in deciding the case for the plaintiff, uses the follow-

lowing language on page 282: " It would seem to me a gross perversion of justice to refuse to release a party from a matrimonial contract whereby no important status affecting the relationship of the parties to the general public or to each other has been established in the face of a situation which, as between the parties and the probable normal result of their continuing union, is attended with an element of such grave potential results." While there is danger of infection in association with a person afflicted with tuberculosis which does not exist in the case of epilepsy, yet so far as is apparent to the medical world at this time the danger of transmission of epilepsy to offspring is vastly greater than in the case of tuberculosis, and the chance of cure much less. This case is interesting as extending the rule for annulment of marriage in the case of fraudulent concealment or statements to other than venereal diseases. *Domschke* v. *Domschke,* 138 App. Div. 454.

In *Anonymous,* 21 Misc. Rep.. 765, cited with approval in *Svenson* v. *Svenson,* 178 N. Y. 60, Judge Truax granted a decree of annulment upon the report of a referee. The defendant husband, in a conversation during their engagement, told the plaintiff that he was in good health, whereas the fact was he was suffering from a chronic and contagious venereal disease (not syphilis) and which his wife contracted, and from which she suffered so acutely that her life was in danger. It is undoubtedly true that the fact that one party to a marriage has, at the time, a venereal disease, is abhorrent to every sense of justice and decency. It means the unchastity of the defendant, the pollution of the innocent victim, and means indecency on the part of the wretch who precipitates such a wrong upon an innocent person who, in the fullness of

her affections, yields her person to his embraces; yet, when we consider the comparative consequences, it would seem to be somewhat of a refined distinction of equitable principles to grant an annulment in the case of a person suffering from a disease described in the case cited as one of a less virulent character than syphilis, and refuse it to a person chained to an epileptic. Both should be freed from an alliance that has no possibility of happiness, and almost a certainty of misery, not only to the parents, but, in the case of epilepsy, to at least the second and probably the third generation.

In *Meyer* v. *Meyer*, 49 How. Pr. 311, which is only a report of a referee in which a judgment was directed declaring void the marriage contract on the ground that the consent of the husband was obtained by fraud, it appeared from the evidence that the plaintiff was suffering from a disease of the vaginal and uterine tract, but it did not appear that the disease was contagious or infectious, and did not imply unchastity. The learned referee uses this language: '' The fact that she offered herself to the plaintiff for marriage amounted to a representation, which the plaintiff had the right to believe, that she was in a marriageable condition, and free from disease which would hinder her from entering into that relation.''

Dr. William Trader, a physician of nine years' experience at the Craig Colony for Epileptics, who was sworn as a witness for the defendant, stated on his direct examination that there is no fixed rule that an epileptic must be vicious; that some are very kind, but at times they have periods when they are destructive, and in some cases vicious and savage. In bearing upon the terrible potentialities to the offspring of epileptic parents, this physician states that about fif-

teen per cent of the children of epileptics are afflicted with that disease, and he further states on cross- examination that he means in the case where either parent has epilepsy. He further states on cross-examination that it is possible and it happens that the disease skips one generation, appearing in the grandchildren and not in the children.

The excellent work of William Pryor Letchworth, " Care and Treatment of Epileptics," says (p. 2): " From the dawn of history the disease has been enveloped in mystery, a mystery which is not even now dispelled, and into which it may be said the light of science has not practically penetrated. * * * 'All the facts which the pathological anatomist and the physiological chemist have gained in the study of this dire malady give no explanation of the *process* that gives rise to the epileptic phenomena.' " (P. 6) : " ' In the majority of cases epilepsy leads to permanent mental disturbances, consisting of intellectual weakness of all degrees, from a slight diminution of mental power to complete idiocy. Not infrequently this is accompanied by morbid changes of character. * * * In addition to permanent degeneration, there occur in epileptics more or less acute mental disturbances. The most important point in connection with these, according to Siemerling, is a dream-like state of consciousness of varying duration and form, with or without delusions, memory lost or only clouded. These ' twilight states ' are especially feared because while they endure, deeds of violence are not infrequently committed.' "

It is well known that in this dream-like state, some of the most atrocious crimes are committed, of which the patient, upon returning to consciousness, is entirely oblivious. It may be stated with reasonable certainty

that three-fourths of the cases of true epilepsy begin under twenty years of age; that it is a progressive disease, and that if the seizures continue after the age of puberty the recoveries are very rare. It may also be stated that the most prolific cause of epilepsy is heredity. It has been stated by an authority upon this subject that in the case of 535 children, offspring of epileptics, thirty-six per cent died in infancy from convulsions, fifteen per cent became epileptics, and only twenty per cent were normal.

At the Twenty-fifth National Conference of Charities and Correction, Dr. James C. Carson, superintendent of the Syracuse State Institution for Feeble-Minded Children, gave expression to the following views upon this subject: "Considering the vast import of insanity, epilepsy, and feeble-mindedness in relation to their own and other forms of degeneracy, a law prescribing some extraordinary penalty should be upon the statute-books of every state for the seduction of any insane, epileptic, or feeble-minded woman; and, further, every state in the Union ought to prohibit the marriage of any person of either sex belonging to any of these classes." Care and Treatment of Epileptics, *supra,* p. 13.

The case of *Gould* v. *Gould,* 78 Conn. 242 (1905), is instructive in showing the trend of legislation in dealing with sexual relations which are fraught with the consequences of the gravest moment, not only to the parties immediately concerned, but to society at large. This was an action for a divorce or a decree of nullity upon the ground that it was in violation of a statute. It appears that in 1895 a statute was enacted which read in part as follows: "No man and woman, either of whom is epileptic, imbecile or feeble-minded, shall intermarry, or live together as husband and wife, when

7

the woman is under forty-five years of age. Any person violating or attempting to violate any of the provisions of this section shall be imprisoned in the state prison not less than three years.'' General Statutes, chap. 325, § 1354.

In 1899, the plaintiff, at the age of twenty-three, married the defendant, who was an epileptic. In 1903 a child was born, and she soon afterwards learned of this statute and brought this action for a divorce or decree that the marriage was null and void. In her complaint the plaintiff alleged that the defendant, although an epileptic, falsely and fraudulently concealed this fact from her and represented that he never had epilepsy, and in consequence of which representations, which she believed to be true, she entered into the contract of marriage. The principal question considered in this case was the validity of the statute, which was upheld, and it was held that it was within the power of the court to grant a divorce upon the statutory ground of fraudulent contract. On page 245 the court, in commenting upon the statute, uses the following language: '' While Connecticut was the pioneer in this country with respect to legislation of this character, it no longer stands alone. Michigan, Minnesota, Kansas and Ohio have, since 1895, acted in the same direction. 2 Howard on Matrimonial Institutions, 400, 479, 480; Laws of Ohio, 1904, p. 83. Laws of this kind may be regarded as an expression of the conviction of modern society that disease is largely preventable by modern precautions, and that it is not unjust in certain cases to require the observation of these, even at the cost of narrowing what in former days was regarded as the proper domain of individual right. It follows that the statute in question was not invalid, as respects marriages contracted by epileptics, after it took effect.''

The states of New Jersey, Wisconsin and North Dakota have also enacted laws to prevent the marriage of epileptics. New Jersey P. L. 1904, p. 270; Laws of Wisconsin, 1911, chap. 663, § 498; North Dakota, Laws of 1913, chap. 207, § 1, and also Code of Iowa, § 2600-p, and § 2600-q.

The case of *Elser* v. *Elser,* 160 N. Y. Supp. 724 (1916), was an action brought by the husband to annul a marriage upon the grounds, *first,* that the defendant was physically incapable; *second,* that he was induced to enter into the marriage contract through fraud in her concealing from him that she was an epileptic. The learned judge found the facts in favor of the defendant, and refused to annul the marriage. In view of the finding that there was no fraud, the case is not an authority here. The learned judge states as follows: " I had a physician called to examine the wife, and he testified that the statistics show that in about 16 per cent. of the epileptic cases covered by the records from which the statistics were compiled the taint was inherited. The plaintiff's counsel urges that public policy requires an annulment decree in order to prevent the coming into the world of progeny tainted by an epileptic strain, but we have not as yet come to that refinement of civilization." The decision of the court did not rest upon the above quoted statement, which was *obiter dictum.* Men like Dr. Carson and Mr. Letchworth, to whose utterances I have referred, who have devoted their lives to the study and treatment of epilepsy and kindred diseases, are our highest authority as to the causes and consequences of epilepsy. There is nothing in an actual " refinement of civilization " which a court of equity should shun.

The case of *Lyons* v. *Susanne Barney, otherwise known as Susanne Lyons,* 132 Ill. App. Ct. 45, cited by

the defendant's counsel, is distinguishable from the case at bar. As stated by the court in the *Lyon* case: "The representations alleged to constitute fraud in this case were mere opinions of the cure inspired, it may be, by a longing hope for relief from the awful malady with which she was afflicted, based upon an absence for some time of its distressing manifestations. The existence of the disease was known to appellant to have been of long duration (15 years) and in the absence of any artifices resorted to by the appellee, operating to prevent an inquiry on his part, the law put him upon inquiry, and, failing to make any, he must bear the consequences of his imprudence and haste." In the instant case, the plaintiff was ignorant of the previous diseased condition of the defendant, and relied not upon her representations of a cure, but as to the fact of her suffering from the disease.

In arriving at the conclusion that a court of equity should annul the marriage in question, I have in mind that fortunately there are no children.

I believe that the safeguards the law has thrown around the marriage relation do not demand that this unfortunate defendant shall be permitted, by her misfortune and misrepresentations and concealments, to drag down the life of the plaintiff which is full of promise, especially when such a union, at best, would be childless, and, at worst, would produce a progeny of potential epileptics, over whose lives heredity would cast its dark shadow, which would extend even across the lives of their descendents.

Judgment accordingly.