THOMAS CROCE, Plaintiff, *v.* CARMELLA CROCE, Defendant.

Supreme Court, Special Term, Queens County, September 15, 1950.

*Freeman & Hyman* for plaintiff.

*Theodore Studwell* for defendant.

PETTE, J. In this contested action plaintiff husband seeks an annulment of the marriage upon the ground of fraud, claiming that defendant concealed from him the fact, alleged and admitted, that one of defendant's daughters, though unmarried, and who lived with defendant, had given birth to two children; and that he would not have entered into the marriage contract had he known the truth. The wife counterclaims for separation on the ground of nonsupport.

The parties, middle aged, were married in September, 1943. He, a widower, with five children, conducted a barber shop in Brooklyn, and she, a widow, mother of seven children, lived with four of her unmarried daughters, in the same neighborhood. One of these daughters was the unwed mother. For about eighteen years prior to their bereavement, the parties and their spouses and children had been on friendly terms. Plaintiff knew prior to the marriage that defendant's daughter in question had at least one child, and he admits that " once in a while " (he) " saw " her " husband." Following the passing of the husband's wife in 1941, he and his three unmarried boys, one of whom was thirteen, continued to occupy rooms in the

rear of his shop until the two older boys joined the service. Plaintiff's courtship of defendant followed, resulting in marriage a year later, and they took up quarters in an apartment, with plaintiff's son and three of defendant's daughters. Some months later defendant's unwed daughter and her baby joined them, and within the next two years she gave birth to a third child. Plaintiff testified that defendant had told him that the girl's husband " was in service."

With respect to the gist of the action, plaintiff testified that when he proposed to defendant, whose youngest daughter was about the same age as his youngest boy, he asked defendant " Is there anything bad wrong in your family?", to which she answered, " No, there's nothing bad wrong in my family." He testified that this conversation was prompted by his " suspicions " about the girl who turned out to be an unmarried mother, and said that he had wanted to bring up his boy and defendant's youngest daughter in a religious home atmosphere, free from any disgracing influence. The exact purport and scope of the language used by the parties is undetermined, except for its bearing on the claim, asserted and denied, that plaintiff understood that the girl was married and there was nothing immoral about her motherhood; but the complaint, confined to concealment, does not charge, and the evidence does not show, any express representation to that effect.

The parties and their respective children lived together as stated, for about two years, during which defendant was a dutiful wife and a mother to plaintiff's son, as well as to her own daughters. Then, in December, 1945, a fire destroyed their apartment, and in the ensuing commotion as to where they were going to live because the accommodations behind the barber shop were inadequate, plaintiff says that he suggested that his stepdaughter with the two children go to live with her " in-laws ", whereupon plaintiff claims that defendant answered that the girl had none, because she was not married. He says that this was the first knowledge he had of the true situation, and the defendant on this occasion further stated that the girl had a third child boarding out. Plaintiff's youngest son, now in the service, corroborated his father as to defendant's asserted disclosures at the time of the fire.

Contrary to plaintiff's testimony, defendant testified that prior to the marriage she told plaintiff of her daughter's " misfortune "; that she was not married and that she had two children at the time; that she " had to tell him the truth because

sooner or later he would find out anyway "; that he " knew everything ", and that " he was satisfied." She denied the claimed conversation on the occasion of the fire.

The parties separated on the very night of the fire and have ever since lived apart, plaintiff furnishing no support to defendant for four years, until he was ordered to do so by the Family Court in October, 1949. This action followed two months later.

With opinion differing widely as to what kind and amount of fraud suffices to annul a marriage contract generally (*Sheridan* v. *Sheridan*, 186 N. Y. S. 470), we meet at the forefront the critical question posed by the peculiar facts — *sui generis* — whether a representation by concealment, concerning the virtue, morality or social status not of the defrauding party, but of a third party, is the kind of fraud that vitiates the marriage contract. In the face of dearth of direct precedent, decision must rest mainly on principle.

Though fraud, aptly termed *hydra multorum sapitum* (*Reynolds* v. *Reynolds*, 3 Allen [Mass.] 605, 606), is capable of multiform perpetration or manifestation, the question of the existence of invalidating sufficiency, in matrimonial cases specifically, as in any civil contract " always depends very much on the nature of the transactions, the means and information possessed by the parties, and their relative situation and condition toward each other." (*Reynolds* v. *Reynolds, supra*, p. 606.)

While " any fraud is adequate which is ' material, to that degree that, had it not been practiced, the party deceived would not have consented to the marriage ' * * * and is ' of such a nature as to deceive an ordinarily prudent person ' " (*Shonfeld* v. *Shonfeld*, 260 N. Y. 477, 479–480; *di Lorenzo* v. *di Lorenzo*, 174 N. Y. 467, 471, 474; *Kronman* v. *Kronman*, 247 App. Div. 186; *Thurber* v. *Thurber*, 186 Misc. 1022) ; and while the operative elements " need not necessarily concern what is commonly called the essentials of the marriage *relation* — the rights and duties connected with cohabitation and consortium attached by law to the marital status " (*Shonfeld* v. *Shonfeld, supra*, p. 479), yet " not every fraud by reason of which the individual may have given consent to the marriage is an adequate basis for annulment " (*Shonfeld* v. *Shonfeld, supra*, p. 479; *Smith* v. *Smith*, 44 N. Y. S. 2d 826).

And so, the authorities concur in holding that to meet the test of materiality essential to dissolve *ab initio* an executed marriage contract — and consonant with the doctrine of the *di Lorenzo* and *Shonfeld* cases (*supra*) the fact misrepresented must

go to the "very essence" of the marriage contract — not necessarily the reciprocal right and duties of the matrimonial status, but nevertheless representations, express or by concealment, of existing material facts bearing directly upon the marriage and the health and happiness of the party imposed upon, and reasonably calculated to affect the well-being of an ordinarily intelligent and prudent person (55 C. J. S., Marriage. § 34; *Rutstein* v. *Rutstein,* 221 App. Div. 70 and cases cited), and must consist, not of mere misrepresentations as to collateral matters (*Fisk* v. *Fisk,* 6 App. Div. 432; *Wendel* v. *Wendel,* 30 App. Div. 447; *Glean* v. *Glean,* 70 App. Div. 576; *Shrady* v. *Logan,* 17 Misc. 329; *Anonymous,* 21 Misc. 765), but must concern, as variously expressed, "the fundamentals of the relation" (*Anonymous,* 21 Misc. 765, 768, *supra*); must consist of gross, outrageous falsehood or misrepresentation (*Sheridan* v. *Sheridan,* 186 N. Y. S. 470, *supra*); "must go to the essence and substance of the contract" (*Smith* v. *Smith,* 44 N. Y. S. 2d 826, 827, *supra*; *Rubman* v. *Rubman,* 140 Misc. 658); must relate to a matter of substance and not to a "whim, caprice or fancy" (*Laage* v. *Laage,* 176 Misc. 190, 193), and in short, as comprehensively put, "must relate to something vital" (*Lapides* v. *Lapides,* 254 N. Y. 73, 80); must be "serious" and "must * * * go to the very essence of and destroy the agreement to marry." (*Schinker* v. *Schinker,* 271 App. Div. 688, 691). See, also, *Washburn* v. *Washburn,* 62 N. Y. S. 2d 569; *Roth* v. *Roth,* 97 Misc. 136; *Berardino* v. *Berardino,* 156 Misc. 203; *Griffin* v. *Griffin,* 122 Misc. 837, affd. 209 App. Div. 883.)

Moreover, the marriage will not be avoided unless the representation was "adequate to induce and induced the action taken" (*Shonfeld* v. *Shonfeld,* 260 N. Y. 477, 479, 481, *supra*; *Waff* v. *Waff,* 189 Misc. 372); and, as in any case of positive or actual fraud, intention to defraud and accomplished deception (*Chaddock* v. *Chaddock,* 130 Misc. 900), and injury (1 Bishop on Marriage, Divorce and Separation, § 537; *Kinnier* v. *Kinnier,* 45 N. Y. 535, 543), are essential, whether the representation was express and active, or by concealment, relating to a material fact (*Costello* v. *Costello,* 155 Misc. 28; *Eldredge* v. *Eldredge,* 43 N. Y. S. 2d 796). The two cases just cited hold that if the facts concealed, whether by silence or half-truth, go to the essence of the marriage contract and in all fairness require disclosure, the deception so practiced will support annulment.

In every case, the fraud must have been an effective cause, and one cannot complain when he knew the truth at the time, or " ' if he neglects to avail himself of means of information within his reach ' " (*Wendel* v. *Wendel,* 30 App. Div. 447, 451, *supra*), or " if he places a blind or willful confidence in representations which were not calculated to deceive a man of ordinary prudence and circumspection, for although he may have been in point of fact deceived and imposed upon, yet it is a consequence or result of his own folly or neglect " (*Wendel* v. *Wendel, supra,* p. 451; *Dodge* v. *Dodge,* 64 N. Y. S. 2d 264; affd. 270 App. Div. 1025), especially where his suspicions had been aroused (26 Cyc., pp. 905–906). Compare *Jones* v. *Jones* (189 Misc. 145) in which the wife had failed to inquire concerning her husband's drinking habits, a fact known in the community where both lived. Nor may one complain where the false representation was known to him at the time to be false (*McGill* v. *McGill,* 99 Misc. 86, revd. 179 App. Div. 343; 2 Schouler on Marriage, Divorce and Separation [6th ed.], § 1158) or where the one failed to disclose what the other spouse knew (*Trefry* v. *Trefry,* 189 Misc. 1013).

In applying the test, the trier of the fact, free to meet each case as it arises (*Shonfeld* v. *Shonfeld, supra,* p. 481), and to decide " whether the fact misstated or withheld is material " (*Reynolds* v. *Reynolds,* 3 Allen [Mass.] 605, 607, *supra*), " is no doubt justified in rejecting, as immaterial, representations which in the case of other types of contract might lead to a different conclusion " (*Shonfeld* v. *Shonfeld, supra,* p. 481) due to public status resulting from a consummated marriage, as to which a higher degree of proof is required than with respect to ordinary contracts (*Fisk* v. *Fisk, supra; Wendel* v. *Wendel, supra; Glean* v. *Glean, supra; Hochman* v. *Hochman,* 68 N. Y. S. 2d 886); the proof must be " clear and convincing " as to all the essential elements of the asserted fraud (*Bentz* v. *Bentz,* 188 Misc. 86, 87; *Gerwitz* v. *Gerwitz,* 66 N. Y. S. 2d 327); the burden is on the party claiming injury by the fraud, and he must show that the representation inducing the marriage was " material to him at least and of such a nature as to deceive a reasonably prudent person " (*Von Brack* v. *Von Brack,* 64 N. Y. S. 2d 885, 887; *Trefry* v. *Trefry, supra*); that he did not acquiesce in the fraud (*Bohok* v. *Bohok,* 186 Misc. 991), and that he sought with reasonable dispatch to disavow the marriage (cf. *Jennings* v. *Jennings,* 186 Misc. 1021).

But even though the representation be made material by either of the parties, determination of materiality and weight nevertheless rests in the court's sound discretion in applying the " immemorial test of fair and conscientious dealing " (*Shonfeld* v. *Shonfeld,* 260 N. Y. 477, 479, *supra*; *Gershick* v. *Gershick,* 44 N. Y. S. 2d 432) in accord with the requirements of public policy and the rule that not every fraud in the inducement is an adequate basis for annulment (*Sobel* v. *Sobel,* 88 Misc. 277).

The facts at bar manifestly fall within the compass of the foregoing rules. Consequently, aside from the issue of credibility on the question of prior knowledge which the court resolves in favor of the wife, a judgment for the husband would be clearly against the weight of evidence. His claim that he — in his situation — for years intimately close to defendant's family, was unaware of actual conditions, taxes credulity; that the wife fulfilled all the obligations, duties and privileges of the union and that both parties lived in harmonious union for two years, is conceded; and that separation came about, not because of plaintiff's asserted sudden discovery that the girl was unmarried, but solely because destruction of the apartment made it impossible for them to have the erring daughter continue to live with them, is a fact which the court finds, upon an objective consideration of the whole situation. To this must be added plaintiff's unexplained omission to discover the alleged fraud with reasonable dispatch, as was his fair obligation (cf. *Jennings* v. *Jennings,* 186 Misc. 1021, *supra*), and to likewise disaffirm the marriage upon his alleged discovery. If he was ignorant of the girl's status before his marriage, his admitted suspicions put him on his guard, and he could have readily unearthed the truth, with the girl thereafter living in his household and giving birth to what he knew to be a second child (although in fact the third) and his acquaintance with her " husband." Besides, the alleged conversation on the occasion of the fire gave him further notice, but it does not appear that he set about to verify the matter even then, which gives emphasis to the view that he knew the truth from the beginning.

But quite independent from all that, on the primary and equally decisive question of materiality, plaintiff's case wholly fails to meet the test. The gravamen of his complaint and proof, is that defendant practiced the alleged deception — that her daughter was married — by remaining silent, when it was her duty to speak, assuming the doubtful existence of such a

duty in the circumstances, and laudable, as was plaintiff's desire to safeguard his boy's morals, even if the alleged fraudulent conversation was had — a talk indefinite for want of a specific direct question whether the daughter was really married — its terms and implications impress the court that the girl's virtue and morality rather than being a serious material element and condition determinative of the giving of his consent, were but casual and immaterial, and merely incidental to his becoming her stepfather; and neither party intended them to be, nor were they in fact or law of the essence of the contract of marriage. Nor is there anything in the conversation revealing an intention on defendant's part to convey a false impression by the alleged silence (cf. *Williams* v. *Williams,* 11 N. Y. S. 2d 611).

Moreover, the consummation of the marriage for two years, the lack of any showing of injury to plaintiff, or harm to his boy's morals, his significant conduct in instituting this action four years after separation, and then just shortly after defendant compelled him to support her, weigh much in attributing to this action its true character so revealed by the events — that of an afterthought — not the spontaneous reaction of an outraged spouse, struck in the solar plexus so to speak, by the pretended revelation, but a designed attempt to implement facts within his antenuptial knowledge or suspicion and so, notice, not pursued by timely inquiry, either before or after marriage. Under the circumstances, therefore, even if defendant misled the plaintiff by concealment, he, a mature man with a large family of his own, experienced with the ways of life, and so presumed to be an ordinarily prudent person, must be held to have acquiesced therein, and will not now, after matrimonial consummation, be heard to complain (*Jennings* v. *Jennings, supra*). To such a man, the application of the rule *caveat emptor* is quite appropriate and does no violence (cf. *Chaddock* v. *Chaddock,* 130 Misc. 900, *supra*), but impels subjection to our forms of law designed to sustain the stability and sanctity of the marriage institution, free from destruction at the will or caprice of a careless, designing or disappointed spouse. If the matter was so important to him as he now asserts, he should not have left it unsettled and entered into the marriage despite his alleged fears (*Reynolds* v. *Reynolds,* 3 Allen [Mass.] 605, 607–608, *supra*). As the court there said concerning the burden of inquiry cast upon one acting upon antenuptial representations: " The law therefore wisely requires that persons who act on representations or belief in

regard to such matters [a spouse's qualifications] should bear the consequences which flow from contracts into which they have voluntarily entered, after they have been executed, and afford no relief for the results of ' a blind credulity however it may have been produced.' \* \* \* Nor is it unreasonable that one should take on himself the burden of inquiry into representations concerning the character and qualities of the person whom he intends to marry, which, by the exercise of due caution and discretion, can be ascertained to be true or false, instead of lying by and using them to defeat a contract after it has become executed, and a portion of its fruits has been enjoyed."

The quotations would seem to apply with greater force where, as here, the concealment relates to the character of a person not a party to the contract.

Prior to the *di Lorenzo* case (174 N. Y. 467, *supra*) it was expressly held that the concealment of out of wedlock birth of children to either spouse was not a material invalidating fraud (*Shrady* v. *Logan, supra*; *Glean* v. *Glean, supra*). Whether those specific rulings survive the relaxation by the *di Lorenzo* case of the basic doctrine as to the interpretation of materiality, has not yet been passed upon (see 26 Cyc., p. 905 note 83). Suffice it for present purposes that the situation at Bar does not present the question, because the misdoing here involved is that of a third party.

It follows that the complaint should be dismissed and judgment granted accordingly. No proof having been adduced upon the trial on the issue of support, the matter is referred to an Official Referee to hear and determine. (See *Gibbons* v. *Gibbons*, 197 Misc. 962.)

Submit findings, conclusions and judgment on notice. No costs to either party.