93 A.2d 500 (1952)
DU PONT
v.
DU PONT (two cases).
Court of Chancery of Delaware, New Castle.
December 30, 1952.
James R. Morford and William Marvel, of Morford, Bennethum, Marvel & Cooch, Wilmington, for cross-plaintiff and plaintiff.
Arthur G. Logan, Wilmington, for cross-defendant and defendant.
SEITZ, Chancellor.
There are complaints in two separate actions which will hereinafter be treated as one. In them plaintiff seeks separate support and maintenance based upon allegations that she was abandoned by the defendant, her husband, without legal cause and that she is in destitute and necessitous circumstances. Defendant's answer denies, inter alia, that plaintiff is his wife and by counterclaim defendant seeks a declaration based on the declaratory judgment act or *501 on legal and equitable principles that plaintiff is not defendant's wife.
This court's jurisdiction over the separate maintenance aspects of the case has been fully established.[1] This court granted interim relief, DuPont v. DuPont, Del.Ch., 90 A.2d 476, and this is the decision after final hearing. By stipulation most of the record in this case is the testimony and exhibits in an unsuccessful annulment action brought in the Superior Court by this defendant.[2] The balance of my record consists of certain oral testimony and stipulated matter.
Defendant sets forth many reasons why the plaintiff is not entitled to support and maintenance. His substantial contentions are:
(1) He and the plaintiff are not validly married because:
(a) Plaintiff's Texas divorce from a previous husband is invalid because it was obtained by fraud and collusion.
(b) Plaintiff induced the New York marriage ceremony with defendant through misrepresentations sufficient to constitute fraud under the applicable New York law.
(2) Plaintiff is not entitled to relief, even assuming the validity of the Texas divorce and the New York marriage, because she is guilty of lying in these proceedings.
Defendant says that even if all the foregoing contentions should be rejected, nevertheless, the facts are such as to justify the court in diminishing the amount of allowance to plaintiff.
This matter can perhaps be best handled by setting forth a chronological narration of the facts as I find them. Plaintiff was born and reared in Texas. On July 7, 1934, when about 23 years of age, she married her first husband, Wigley. He was many years older than the plaintiff and had been previously married. In June of 1936 she left for California to pursue a career in the movies with Wigley's consent. She was not successful. Plaintiff left California and went to New York to pursue a stage career in the Fall of 1937, with Wigley's consent.
Shortly after her arrival she met Mr. & Mrs. A at the Rainbow Room, which I am told was then one of New York's better night clubs. Mr. & Mrs. A apparently gave many parties at the Rainbow Room and invited plaintiff to such parties. In 1938 Mr. A started having dates with the plaintiff and started taking her out alone to night clubs. Shortly after plaintiff met Mr. A she asked him for money which she said she needed for clothes and to support her and her mother. He gave her between $2,000 and $3,000. From then on Mr. A gave her money regularly until September, 1948 when she told him she was going to marry the defendant. In all he gave her a total of from $65,000 to $75,000. Plaintiff's mother, who lived with plaintiff, was aware that she was receiving such money.
In the meantime, on July 6, 1940 the plaintiff divorced her first husband, Wigley, in Texas. Defendant here seeks to attack the validity of the Texas divorce but I conclude, as did our Superior and Supreme Courts, that it may not be here attacked. The fact that its validity is being raised defensively does not in my opinion change the result since our Supreme Court held that the Full Faith and Credit Clause precluded a collateral attack.
Plaintiff says that Mr. A made the payments to her as a "benefactor" and "sponsor". Some time in the early 1940's a form of an agreement was drawn by Mr. A purporting to be a contract whereby he was to advance money to further her professional artistic career and was to receive 10% of her profits. Plaintiff made practically no money from this source. Mr. A never received any commissions.
Mr. A testified that he and the plaintiff had sexual intercourse periodically from 1940 to 1945. Plaintiff denies this testimony. Without setting forth in detail the cumulative effect of all the testimony, it is patently clear to me that Mr. A contributed these large sums of money to the plaintiff *502 in return for companionship and sexual favors. I conclude that the agreement whereby he was to be a sponsor and to receive a percentage of her earnings from her professional work was a subterfuge. In fact he gave her large sums long before the agreement was drawn. It is also noteworthy that prior to her marriage to defendant, plaintiff asked Mr. A to destroy the alleged agreement. In 1945 Mr. A, still a married man, attempted to terminate his relationship with plaintiff and actually stopped making the regular payments. I find that their sexual relations terminated in 1945 but that she made it clear that there would be unpleasant business consequences if he did not resume the regular $500 monthly payments. They were resumed.
The testimony shows that there were many other men in plaintiff's life during what I shall call the New York "pre-duPont" phase. For example, in 1943 she met an Italian Count who was also a married man. She knew it. Despite plaintiff's denial the testimony leads me to conclude that the plaintiff had sexual relations with the Count on numerous occasions and that the Count gave the plaintiff many thousands of dollars in return for her favors.
There is testimony concerning many other men and in each case plaintiff denies having had sexual relations with them, but I believe it fair to infer from the entire testimony that she did have such relations with at least some of them.
Thus, I conclude that during the period of some several years prior to her marriage to defendant in New York, on November 20, 1948, the plaintiff supported herself and her mother by taking substantial sums of money from men in return for sexual favors. The amount of money received from her first husband and from her father's estate was so insignificant that it can be ignored here.
Now that we have seen plaintiff in what defendant would agree is her "true light", it becomes equally important to place defendant in his true light. In 1947 defendant, then a married man of mature years, while visiting a friend, saw a picture of the plaintiff. He said he would like to meet her and on the occasion of his next trip to New York phoned the plaintiff. Using his friend as an entree, he took the plaintiff to lunch. Portentously, this was April 1, 1947. Defendant told plaintiff he was married. I am convinced that both plaintiff and her mother tried by their remarks to give defendant the impression that plaintiff was highly virtuous and that they did not approve of the plaintiff's going out with a married man. This was a pretense since plaintiff in fact had been intimate in varying degrees with various married men and her mother knew it. However, even with due allowance for male egotism, it must be said that a reasonably prudent man should have wondered about words so at variance with actions.
Within a month or six weeks after defendant first met plaintiff he asked her to spend the week-end with him in Connecticut. It must be kept in mind that at this time he had been married about 23 years and, according to his own testimony, was "happily married". Plaintiff knew he was married and he knew that plaintiff knew he was married. Plaintiff at first refused, but finally agreed to spend the weekend with defendant. Defendant testified that during that week-end they had sexual intercourse. Plaintiff denies this but I beleive that the fair inference is that they did have such relations.
Some time thereafter plaintiff told defendant that her first husband, Wigley, was sexually impotent throughout their marriage. However, defendant conceded that he had been told by plaintiff that she had been intimate with at least two other men, one in California and one in New York.
Plaintiff and defendant engaged in sexual intercourse at "regular and frequent intervals" after the first week-end together. Thus, while still married and living with his wife defendant spent much time with the plaintiff. In September 1947 he chartered a yacht on which he and plaintiff took a cruise and slept together every night. Many other incidents too numerous to mention took place, both before and after talk of marriage, which revealed sexual intimacies between plaintiff and defendant.
*503 In seeking to assert fraud as a defense, defendant relies principally upon plaintiff's misrepresentations concerning her prior life with particular emphasis on the fact that she took money for sexual favors. He testified that he would not have married plaintiff had he known of her mercenary sex life. There is a certain irony about defendant's harping on this point in view of the evidence concerning plaintiff's conduct which I have just narrated. But defendant's explanation is that while he of course knew that she had been sexually intimate, nevertheless, he had no reason to believe that she took money for her favors.
Let us put aside for the moment the legal question as to whether under New York law the problem is affected by the receipt of money for sexual favors. It is nevertheless apparent that by paying for various yacht and train trips, etc., at a time when plaintiff was bestowing her favors upon him, he was in a sense purchasing such favors. The excuse of "anticipating marital privileges" is hardly one which a court can consider decisive when the relations were adulterous.
The evidence also shows that defendant, prior to the marriage ceremony, entertained doubts concerning plaintiff. The 1947 Labor Day week-end has a special significance. Plaintiff had told defendant that she planned to spend that week-end in the country. However, he was advised by a third party that she was going to spend a week-end with a certain man on a yacht. Defendant  still living with his wife  employed a detective agency to check on plaintiff's movements during the week-end. The detective's report confirmed the fact that she went on a week-end yacht trip with a man. Plaintiff lied to the defendant concerning the matter but when defendant confronted plaintiff with his evidence, she explained that she had changed her mind and that, in any event, they were chaperoned by a married couple and nothing improper took place. Defendant testified that he was completely satisfied with her explanation.
Defendant, prior to the marriage, also requested a credit agency to make a private investigation to determine the status, condition and source of the Barton family's income. Theretofore, defendant was under the impression that plaintiff's money came from her father's estate and from payments made by her first husband. The report, which was filed long before the marriage, showed a poor credit rating for plaintiff's mother and showed that her father's estate had been liquidated and that nothing was left. The report also stated the following:
"All attempts to secure information concerning the source of income of both individuals [Mrs. Barton and the plaintiff] has proved unsuccessful. Impressions of informants is the daughter is in the receipt of a private income which apparently permits her to live on a good scale. * * * Investigation conducted at both present and former home addresses, find the impression existing that both mother and daughter live up to and occasionally beyond their income. We could learn of nothing detrimental to the character of either individual. The daughter over a period of years has met household obligations and it is the concensus of opinion the bulk of the income at the disposal of the two individuals comes apparently through the daughter."
Defendant apparently also made inquiries of several individuals concerning the plaintiff prior to the marriage but testified that all the reports from them were favorable. Shortly before his marriage to plaintiff the defendant sought to have her sign a pre-marital contract concerning property. She refused to sign it.
Defendant's first wife divorced him in July of 1948 and on November 20, 1948 plaintiff and defendant were married in New York City. Defendant left plaintiff without "legal" cause on July 28, 1950 and has failed to support her except as required by court order.
The parties are in disagreement as to whether or not the refusal of the Delaware Superior Court to grant an annulment is conclusive in this court. Assuming it is *504 not, the parties are also in disagreement as to whether or not the defense of "no marriage" is to be determined by the Delaware law or the New York law.
Assuming that the denial of an annulment in the Superior Court is not decisive here because it was limited to a consideration of the Delaware annulment statute, Rev. Code 1935, § 3497, and further assuming that New York law governs and may be here asserted defensively, let us see whether defendant would be entitled to have the marriage annulled were this such an action in New York.
Defendant says that plaintiff represented her life in New York to be moral whereas it was an immoral and mercenary one. To be explicit, defendant relies upon plaintiff's concealment of the receipt of money for sexual favors as constituting active and passive fraudulent misrepresentations. Assuming that such action would, absent other material facts, constitute the basis for the granting of an annulment in New York, let us see whether defendant's own knowledge and conduct would affect that result under New York law.
Defendant, who was himself guilty of adultery with plaintiff contends that plaintiff made fraudulent representations to him as to her morality because, while he knew she had sexual relations with him and with at least two other men, he did not know that she had received money for such favors from still other men and that she was in fact a "kept woman" prior to their marriage. While the facts there involved were not analogous, I believe the following legal principles quoted with approval in the New York case of Wendel v. Wendel,[3] 30 App.Div. 447, 52 N.Y.S. 72, 75, are particularly apposite here:
"* * * A party cannot escape from obligations which he has voluntarily assumed, on the ground that he has been deceived and defrauded, * * if he places a blind or willful confidence in representations which were not calculated to deceive a man of ordinary prudence and circumspection, for, although he may have been in point of fact deceived and imposed upon, yet it is a consequence or result of his own folly or neglect."
The defendant engaged in illicit sexual relations with plaintiff almost at the outset of their relationship. She knew, and he knew she knew he was married. He also knew that she had similar relations with two other men. He testified that she had such relations with one of the men at her doctor's suggestion because of her husband's impotency. She thus confessed adultery to him. It is hard for me to believe that such an explanation should have been very persuasive to a man of ordinary prudence who was in possession of defendant's knowledge. Moreover, he was suspicious of plaintiff. See language in Croce v. Croce, supra. Why did he ask her to sign the pre-marital financial agreement? The circumstances surrounding the manner in which she spent the 1947 Labor Day week-end and her lie in connection therewith as well as the language of the credit report should have been further signs to any ordinary prudent man contemplating marriage that further investigation was in order. Such an investigation would have been revealing. Defendant was no child. He was a professional man of mature years with at least the veneer of sophistication.
Thus it would seem to be pertinent to ask whether, under the circumstances, it makes any difference that, unknown to defendant, she engaged in sexual relations with some men for money prior to her marriage to defendant. I commence with the premise that, leaving aside the money question, not even the New York courts would grant an annulment to a husband where his wife had premarital sexual relations which she failed to disclose to her husband when he knew of others including his own which were adulterous. Compare Graham v. Graham, 211 App.Div. 580, 207 N.Y.S. 195.
The question then is whether New York would recognize a difference here because plaintiff had been sexually promiscuous for pay. The few authorities to be found follow the Delaware rule which, without *505 more, recognizes no such distinction in an annulment action. See Du Pont v. Du Pont, Del., 90 A.2d 468. There is no precise New York authority but I do not believe New York would draw a distinction between "sex for hire" and otherwise. To do so might necessitate a re-examination of the aphorism that "consideration is the favorite child of the law of evidence". I believe the validity of my statement is reinforced in a case, such as this, where the party seeking relief had premarital sexual relations with the other party, knew of others, and where he paid for trips, etc., on which such adulterous relations took place. I reach this conclusion because I believe the New York courts, even under their so-called "liberal"[4] view of fraud, would not give judicial recognition to such a distinction particularly under the circumstances of this case.
Assuming the premises mentioned at the outset, I conclude that this defendant would not be entitled to an annulment even in New York because:
(1) The circumstances were such as to put a reasonably prudent man on notice that further investigation was necessary, and
(2) Defendant's participation in and knowledge of much of plaintiff's premarital sex life preclude his being heard to complain of other such sexual activities by plaintiff even though some were for money and unknown to him.
Nor do I find evidence sufficient to support the other alleged misrepresentations relied upon by defendant as grounds for annulment under New York law.
I now consider whether the plaintiff is guilty of perjury in these proceedings, and if so, what the consequences should be.
I am fully convinced that plaintiff deliberately answered certain interrogatories and deposition questions falsely. They deal largely with the source of her money  particularly the money received from Mr. A. The fact that she admitted the source of her money when confronted with incontrovertible evidence does not excuse the perjury. This is a serious matter. I assume that I have the discretionary power either to deny or restrict relief in such circumstances. I recognize that this same issue was raised in the annulment action in connection with the granting of attorney's fees to this plaintiff and that for reasons there stated was not recognized as affecting the application. However, I find falsity on a material point. While the matter concerning which the defendant lied is here material, I feel that in a support action, where I have concluded she is otherwise entitled to support, it is sufficient to consider her deviation from the truth in fixing the amount of support. I further conclude that among other things, the plaintiff's concealed activities prior to the marriage, especially when combined with her post-marital actions, should also go to diminish the award. See 42 C.J.S., Husband and Wife, § 624.
I conclude that plaintiff is entitled to separate maintenance. I further conclude that plaintiff is in "destitute and necessitous" circumstances within the meaning of that allegation in the complaint. I assume rather than decide that such a finding is jurisdictionally necessary.
I now consider the amount of the award to plaintiff. Plaintiff seeks $1,500 per month. She was granted interim relief of $600 per month. I can say that in the absence of the "diminishing" factors mentioned above, I would here have awarded plaintiff a substantially larger sum because defendant has substantial means. However, for the reasons stated, I do not feel that she is entitled to the benefit of the ordinary rule and should in fact be penalized. I conclude that $300 per month commencing February 1, 1953 and until further order of the court will be reasonable. Past payment, however, will not be disturbed. I believe the payment of plaintiff's additional past bills should be made by defendant, plus the money borrowed with interest. However, the judgment will prohibit plaintiff from procuring anything in the future on defendant's credit.
As to defendant's counterclaim seeking the return of certain personal property, I *506 conclude that the matter has not been adequately briefed to enable me to decide the matter legally. If the parties cannot agree on a division I will fix a brief schedule. Defendant's other counterclaims are denied. I believe Civil Action 190 should be closed out by disposing of the balance remaining on deposit in the Court.
Plaintiff's attorney will be allowed a final attorney's fee of $2,500 and disbursements.
Order on notice.
NOTES
[1] DuPont v. DuPont, Del.Ch., 79 A.2d 680, affirmed, Del., 85 A.2d 724.
[2] Anonymous v. Anonymous, Del.Super., 85 A.2d 706, affirmed sub nom., DuPont v. DuPont, Del., 90 A.2d 468.
[3] See also the language in Croce v. Croce. 199 Misc. 635 100 N.Y.S.2d 97.
[4] But see Woronzoff-Daschkoff v. Woronzoff-Daschkoff, 303 N.Y. 506, 104 N.E.2d 877.